UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ELITE DESIGNS, INC.,<br>a Rhode Island corporation, and<br><br>ANTHONY ANTONELLI, individually<br>and as an officer of the corporation,<br><br>Defendants. | ) | C.A. No. 05-058-S |

# MEMORANDUM OF LAW

## I. Statement of the Case

On February 14, 2005, plaintiff, the United States of America, filed a complaint against defendants Elite Designs, Inc. ("Elite Designs") and Anthony Antonelli relating to defendants' violations of the Federal Trade Commission's ("FTC's") Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures" ("Franchise Rule" or "Rule"), 16 C.F.R. Part 436, and Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a). The complaint alleges, inter alia, that defendants sold franchises to the public, failed to provide prospective franchisees with accurate and complete basic disclosure documents, used unsubstantiated earnings claims to induce consumers to purchase franchises, and made generally disseminated earnings claims in advertisements without

disclosing in immediate conjunction with the claims the number and percentage of prior purchasers known to have achieved the same or better results.

Elite Designs and Antonelli were served on February 14, 2005, and an answer was filed on March 21. A Rule 16 Conference was held before the Court on May 16. On May 24, the government served upon defendants document requests and interrogatories. The following month, the government noticed its deposition of Antonelli. The government received documents in response to its request for production and interrogatory answers from the defendants on July 11. Subsequently, on July 28, the government deposed Antonelli. A settlement conference before Magistrate Judge Lovegreen has been set for September 21, and trial currently is scheduled for the March 2006 trial calendar.

As discussed further below, the evidence obtained at the July 28 Antonelli deposition, in conjunction with the documents produced by defendants in response to the government's first request for production of documents, have provided the government with evidence warranting the addition of a new party, The Designer Collection, Inc. ("The Designer Collection"), as a named defendant along with the original defendants for the violations alleged. Pursuant to Federal Rules of Civil Procedure 20(a) and 21 the government has submitted a motion for leave of this Court to join The Designer Collection as a defendant.[1]

## II. Factual Background

As alleged in the original complaint, Elite Designs and Antonelli have been in the business of selling fashion jewelry display rack business ventures. Antonelli is the president and

[1] The government advised opposing counsel of its intention to ask the Court for leave to add The Designer Collection as a defendant. Opposing counsel will determine whether to oppose the motion after receiving a copy of the government's filing.

vice-president, secretary, and treasurer of the company. (Transcript at 33, lines 7-13).[2] Defendants have promoted their business ventures through classified advertisements in newspapers across the country. (Transcript at 84, lines 18-23). The advertisements make representations about the earnings potential of the business venture, and contain a toll-free telephone number for consumers to call to learn more about the business venture. For example, Elite Designs ads proclaim, "[m]ake $100K/yr."

Consumers who called Elite Designs' toll-free telephone number were connected to Antonelli's employees or agents who made further representations about the earnings potential of the business venture. Antonelli's employees or agents represented that business ventures consisting of 30 locations typically generate a profit of more than $1,500 per week. After speaking with potential investors, Antonelli or his employees or agents sent potential distributors pre-investment promotional material purporting to contain materials required to be disclosed by the Franchise Rule.

As alleged in the original complaint, the oral and written earnings claims made by defendants lack support and proper substantiation in violation of the Franchise Rule. In addition, the disclosure document provided to potential consumers fails to inform consumers about other business venture purchasers, as required by the Franchise Rule.

After filing suit against the defendants in February 2005, the government learned that Antonelli was involved in several business opportunities. In addition to Elite Designs, Antonelli sold candle display rack business opportunities under the names ExpresScents, Inc., Forever Scents, Designer Scents, Country Kitchen Candles, Inc., and Candles of Tomorrow, Inc. Most of

---

[2] All deposition transcript pages cited to are attached.

these ventures were depicted in promotional material as divisions of Elite Designs, Inc., making their relationship to the named defendant, Elite Designs, unclear. Further complicating the government's understanding of the relationship between Elite Designs and the other business opportunities was the fact that in addition to candles most of the other entities also advertised jewelry distributorships. After filing the complaint the government also was advised that Elite Designs no longer sold business opportunities. Rather, Antonelli sold jewelry display rack business ventures through a new company called The Designer Collection.

The government deposed Antonelli on July 28, 2005.[3] The evidence acquired at the deposition leads the government to move the Court for leave to amend the complaint and join The Designer Collection as a defendant.[4] Antonelli testified that as of approximately September 2, 2004, the incorporation date of The Designer Collection, Elite Designs has not sold jewelry display rack business ventures.[5] (Transcript at 42, lines 7-13). Rather, jewelry display rack business ventures have been sold by The Designer Collection.[6] Antonelli is the president and vice president, secretary, and treasurer of The Designer Collection. (Transcript at 180, line 21 through 181, line 7). The Designer Collection operates out of the same location as Elite Designs,

---

[3] The deposition was suspended rather than closed due to time constraints.

[4] In order to avoid unduly complicating the proceedings, the government is not seeking the addition of ExpresScents, and Antonelli's other ventures, as parties.

[5] Elite Designs is still an active corporation, involved in non-business opportunity activities. (Transcript at 15, lines 1-3).

[6] Defendants' counsel informed the government on August 3, 2005, that Antonelli temporarily has suspended the sale of all new business ventures, including those sold by The Designer Collection. The government has not confirmed this claim. The Designer Collection still operates through its existing franchisees.

and sells or has sold jewelry display rack business ventures in essentially the same manner as did Elite Designs. Like Elite Designs, The Designer Collection promotes its business ventures through classified advertisements in newspapers across the country. (Transcript at 201, lines 5-15). The advertisements make representations about the earnings potential of the business venture, and contain a toll-free telephone number for consumers to call to learn more about the business opportunity. For example, The Designer Collection ads exclaim, "EARN 100K!"

Consumers who call the toll-free telephone number provided in the advertisements are connected to sales representatives who make further representations about the earnings potential of the business venture. Antonelli indicated at his deposition that the sales script used by The Designer Collection was the same script employed by Elite Designs. (Transcript at 202, line 24 through 205, line 18). Thus, potential investors were told that business ventures consisting of 30 locations typically generate a profit of more than $1,500 per week. After speaking with potential investors, employees or agents of the proposed defendant sent potential distributors pre-investment promotional material.

Each of the oral and written earnings claims made by The Designer Collection lack the requisite support. Antonelli conceded in his deposition that he did not know of any distributor from The Designer Collection who had earned $100,000. (Transcript at 146, lines 15-17). Furthermore, the claim made by Designer Collection sales representatives that 30 locations typically generate a profit of more than $1,500 per week is based on the premise that the average distributor can sell two pairs of jewelry at each location per day. However, Antonelli testified

that he did not know if the average location sells two pairs of jewelry per day.[7] (Transcript at 161, lines 3-8; 163, lines 4-15).

The oral and written earnings claims made by The Designer Collection violate the Franchise Rule in several respects. First, The Designer Collection lacks a reasonable basis for the earnings claims. 16 C.F.R. § 436.1(b)(2), (c)(2) and (e)(1). Second, The Designer Collection fails to disclose, in immediate conjunction with each earnings claim, in a clear and conspicuous manner, that material which constitutes a reasonable basis for the claim is available to prospective franchisees. 16 C.F.R. § 436.1(b)(2) and (c)(2). Third, The Designer Collection fails to provide prospective franchisees with an earnings claim document, as required by the Franchise Rule. 16 C.F.R. § 436.1(b) and (c). Fourth, The Designer Collection fails to disclose, in immediate conjunction with the generally disseminated earnings claims, information required by the Franchise Rule including the number and percentage of prior purchasers known to have achieved the same or better results. 16 C.F.R. § 436.1(e)(3)-(4). As demonstrated above, the original complaint in this matter alleges these same violations with respect to Elite Designs and Antonelli.

Like Elite Designs, The Designer Collection also violates the Franchise Rule's basic disclosure requirements. 16 C.F.R. § 436.1(a). As noted, The Designer Collection sends potential investors pre-investment material that contains a disclosure document. (Transcript at

---

[7] Though Antonelli made these remarks in reference to a conversation that took place between an undercover FTC investigator and Elite Designs sales representative, as noted, it appears that Elite Designs and The Designer Collection employed the same script. Furthermore, the government has substantial reason to believe that, as was true with Elite Designs distributors, Antonelli did not actively calculate the earnings of The Designer Collection distributors. See e.g., Transcript at 153, line 18 through 156, line 13.

185, line 5 through 186, line 18). Though the disclosure document purports to contain materials required to be disclosed by the Franchise Rule, the document fails to inform consumers of the identity and contact information of other business venture purchasers. The disclosure document also fails to disclose that Antonelli is subject to an order to cease and desist and refrain ("order") issued by the State of South Dakota in August 2004. (Transcript 185, line 5 through 195, line 1). The order was issued after ExpresScents advertised in a South Dakota newspaper without registering as a business opportunity, as required by South Dakota law, and a state investigation revealed that Antonelli as president of the company and others made misleading statements about the business opportunity. The failure to disclose information about other consumers as well as the omission of the order in The Designer Collection's disclosure document are violations of the Franchise Rule. The original complaint also alleges basic disclosure violations in violation of 16 C.F.R. § 436.1(a).[8]

**III. Argument**

Federal Rule of Civil Procedure 21 ("Rule 21") provides that parties may be added by the Court "at any stage of the action and on such terms as are just." The primary purpose behind Rule 21 is two-fold: to prevent multiple, parallel litigation and to encourage liberal joinder of parties. City of Manchester v. National Gypsum Company, 637 F. Supp. 646, 657 (D.R.I. 1986). In determining whether to permit joinder, courts often look to whether "the motion to amend comes so late in the litigation that it will delay the case and whether the amendment will unduly prejudice any parties to the action." Id.

---

[8] With the exception of the addition of The Designer Collection, as well as changing the address of Elite Designs from 17 Thelma Avenue to its current address at 18 Thelma Avenue, the proposed amended complaint and original complaint are the same.

The government's motion to add The Designer Collection as a defendant should be granted because it will not cause undue delay nor unduly prejudice the existing defendants. In fact, it is difficult to discern how the addition of The Designer Collection will cause delay or prejudice. Like Elite Designs, Antonelli essentially is The Designer Collection: he is the president, vice-president, secretary, and treasurer of the company. The proposed new defendant thus would not in any practicable sense be "new" to the litigation. Furthermore, no new issues need be raised as The Designer Collection faces the same allegations as Elite Designs. In addition, granting the government's motion to join would result in little additional discovery as the government's first request for production of documents to Elite Designs sought all documents relating to The Designer Collection and the government's interrogatories also encompassed The Designer Collection. [9]

Federal Rule of Civil Procedure 20(a) ("Rule 20(a)") also is pertinent to the current matter. Rule 20(a) provides, in relevant part:

> All persons . . . may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.

Federal Rule of Civil Procedure 20(a). It is well settled that Rule 20(a) "is to be construed liberally in order to promote trial convenience and to expedite the final determination of disputes,

---

[9] Furthermore, the government has moved to amend the complaint promptly after taking Antonelli's deposition. That deposition provided information crucial to this motion.

thereby preventing multiple lawsuits." League to Save Lake Tahoe v. Tahoe Regional Planning Agency, 558 F.2d 914, 917 (9th Cir. 1977); see United Mine Workers of America v. Gibbs, 383 U.S. 715, 724 (1966) ("Under the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged").

Federal Rule of Civil Procedure 20(a) imposes two requirements for the joinder of defendants: (1) a right to relief must be asserted against each defendant relating to, or arising out of, the same transaction or occurrence or series of transactions or occurrences; and (2) some common question of law or fact must be present with respect to all parties in the action. See Mosley v. General Motors Corporation, 497 F.2d 1330, 1333 (8th Cir. 1974). The circumstances present here satisfy both requirements.

With respect to the first requirement, the relief sought by the government against The Designer Collection relates to the same series of "transactions" and "occurrences" as those referenced in the original complaint against Elite Designs and Antonelli. The Designer Collection engaged in the very same conduct, including earnings claims and failures to disclose, identified in the complaint against the existing defendants.

Likewise, the second requirement is met in that there are common questions of law and fact with respect to both the current defendants and proposed defendant. The questions of law and fact that the government must answer in the instant matter against Elite Designs and Antonelli, e.g., whether the business opportunities sold are franchises as defined by the Rule, whether earnings claims were made in violation of the Rule, and whether basic disclosure violations occurred, are the same questions that the government must answer in an action against

The Designer Collection.

Furthermore, the interests of justice and judicial economy are furthered if The Designer Collection is joined as a defendant in this matter. The interests of justice are advanced because any accounting of liability and responsibility for consumer losses related to the sale of jewelry display rack ventures will be incomplete if The Designer Collection is not added as a defendant. Judicial economy is promoted because if the government is allowed to amend the existing complaint to add The Designer Collection as a defendant the government need not file a second, separate suit against The Designer Collection.

**IV. Conclusion**

For the reasons set out above, the United States respectfully requests that the Court grant it leave to amend its complaint to join The Designer Collection as a defendant.

RESPECTFULLY SUBMITTED,

UNITED STATES OF AMERICA

PETER D. KEISLER, JR.
Assistant Attorney General
Civil Division
United States Department of Justice

EUGENE M. THIROLF
Director
Office of Consumer Litigation

AMY E. GOLDFRANK
Trial Attorney
Department of Justice
Office of Consumer Litigation
P.O. Box 386
Washington, D.C. 20044
202 307-0050
Fax: 202 514-8742

OF COUNSEL:

EILEEN HARRINGTON
Associate Director of Marketing Practices
Federal Trade Commission

MICHAEL J. DAVIS
Attorney, Federal Trade Commission
600 Pennsylvania Avenue, NW, Room 238
Washington, D.C. 20580

DATED: August 15, 2005.

Certificate of Service

I hereby certify that a copy of the foregoing Memorandum in Support of Motion For Leave To Amend Complaint, was served, postage prepaid this 15th day of August, 2005 upon:

Stephen J. Reid, Jr.
Blish & Cavanagh, LLP
Commerce Center
30 Exchange Terrace
Providence, Rhode Island 02903

[signature]

# EXCERPTS FROM ANTONELLI DEPOSITION

Q. Is Elite Designs still an active corporation?

A. Yes, it is.

Q. How many employees does the company have?

A. Currently? I believe two. Three including myself. I'm sorry.

Q. Who are the employees?

A. Mary Hunt, and Matthew Carriglio.

Q. Any other employees?

A. Anthony Antonelli.

Q. Any other?

A. No.

Q. Mary Hunt, what is her position?

A. She's administrative assistant/bookkeeping.

Q. Did you hire her?

A. Yes.

Q. Did you provide her with any training?

A. No.

Q. Was she experienced in administrative work?

A. Very.

Q. Matthew Carriglio.

A. Correct.

Q. What is his position?

A. My wife.
MR. REID: Don't we all?
Q. Besides your wife.
A. No, I don't.
Q. Is there a Board of Directors?
A. No, there is not.
Q. Are you an officer of Elite Designs?
A. Yes. I'm the president.
Q. Who is the vice president?
A. Actually I am now, with the departure of my former partner. I believe in the annual report you'll see that I'm the office holder of every position, vice president, treasurer, and secretary.
Q. Are you director of the company?
A. I don't believe that position exists.
Q. Do you own stock in the company?
A. Yes.
Q. How much?
A. I believe it's 600 shares.
Q. Is that 100 percent of the stock?
A. I believe so.
Q. You receive a yearly salary?
A. I receive an officer's draw.
Q. What does that mean?
A. That fluctuates based upon the success of

Q. Where did the writers get their information from?

A. From -- from the companies, the various companies of what we wanted the writer to write.

Q. Who at the various companies?

A. Myself, my -- me.

Q. You mentioned Elite Designs does not currently sell jewelry rack displays?

A. Currently, no.

Q. And Elite Designs stopped selling them what date?

A. I would have to estimate in September of '04 when the Designer Collection was incorporated.

Q. Do you have any previous experience with business opportunities?

A. Previous from me starting a corporation selling business opportunities?

Q. Do you have any experience, previous experience, selling products to distributors, meaning consumers, who then sell it to the general public?

A. Yes.

Q. Can you explain what previous experience you have?

A. In, I think, 1995 or '96, an individual

they were companies that he's formed.

Q. Who owns Mark V?

A. The individual's name is Bob King.

Q. Do you know what they sell?

A. Jewelry. I was their supplier for seven years prior to me actually getting into this business. That's how I was educated in it.

Q. So you, meaning Elite Designs, sold jewelry to Mark V?

A. Correct.

Q. And Mark V then sold the jewelry to distributors?

A. Correct.

Q. Do you know whether John McDonald worked for other companies, meaning none of your companies, other than your companies?

A. I'm not sure.

Q. Let's turn back to when Elite Designs was selling distributorships to consumers. I'm interested in learning about the sales process. How did it work? How did people even learn about Elite Designs?

A. Through the newspaper ads.

Q. Did you advertise anywhere else besides newspapers?

word "potential" in there which is what we did and that was from Jonathan Neff.

Q. That's not what you said you said; you said previously --

MR. REID: Objection. Argumentative. What he said is reflected in the transcript.

MS. GOLDFRANK: All right.

BY MS. GOLDFRANK:

Q. How does adding "potential" change anything?

MR. REID: Objection. You may answer.

A. It clearly -- potential, the word defined means it's a possibility and that's why we put it in there.

Q. Do you know of any distributor who made $100,000 from the Designer Collection, Incorporated?

A. No.

Q. Who wrote this ad?

A. Probably the ad agency comprised it and sent it over for my review and I approved it.

Q. And on behalf of which company did this ad run?

A. It says the Designer Collection.

Q. So does Designer Collection sell jewelry as well as candles?

(Off-the-record discussion.)

BY MS. GOLDFRANK:

Q. Is the Designer Collection, is that name trademarked?

A. No.

Q. Elite Designs, is that trademarked?

A. No.

Q. Is the Designer Collection unique to your company?

MR. REID: The name or the product?

MS. GOLDFRANK: The name.

A. I don't understand the question. Is it unique to my company?

Q. You don't have any right to the name, is that correct?

A. It's incorporated in the State of Rhode Island, I do, but not anywhere else.

Q. Did you ever track the weekly earnings of Elite Designs distributors?

THE WITNESS: Me personally?

MS. GOLDFRANK: Yes.

A. No.

Q. Did anyone at Elite Designs track?

A. Not track but kept a folder for anyone who submitted their earnings reports.

Q. And why would people submit their earnings reports?

A. To comply with the money back guaranty that we were offering them.

Q. Did anyone ever submit all of their earnings claims?

THE WITNESS: For an entire year?

MS. GOLDFRANK: Yes.

A. I don't believe so.

Q. Did you or anyone else at Elite Designs calculate how much each distributor was earning?

A. There's a section on their sales reports that asks for that and they need to fill that in before they send it to us.

Q. Did you ever track the average length it took Elite Designs distributors to recoup their initial investment?

MR. REID: Objection. You may answer.

A. Did I ever track the time it took someone to make back their initial investment?

Q. Right.

A. No, I did not.

Q. Anyone at your company that you know of?

A. No.

Q. Did you ever track -- and by you I mean

you individually or Elite Designs -- the yearly earnings of Elite Designs distributors?

MR. REID: Objection. You may answer.

A. No.

Q. What was the basis for telling potential investors that the average Elite Designs distributor earned a profit of at least a thousand dollars a week?

A. Based on mathematical calculations of the number of retail locations they would have, combined with an anticipated amount of sales, we came to that figure.

Q. When you say -- or isn't the average Elite Designs distributor based on fact? Isn't the -- can't that be calculated?

A. No, because they don't owe us anything as far as earning calculations or earning updates or reports. If they want to participate in the company's money back guaranty, they need to send their service forms in which will contain that information regarding how their sales are going.

Q. You could track how much an average investor is making, is that correct?

MR. REID: Objection. You may answer.

A. If they complied with that and sent their

service forms in.

Q. Or you could send out letters asking how much people have made, is that correct?

MR. REID: Objection.

A. Yes.

Q. You could call them, is that correct?

MR. REID: Objection. You may answer.

A. Yes, I could do that I suppose.

Q. That was never done?

A. No.

Q. So you don't know what the average Elite Designs distributor is actually making?

A. No.

Q. What was the basis for telling potential investors that the average Elite Designs distributor recouped his initial investment in three to four months?

MR. REID: Objection. Where is that?

MS. GOLDFRANK: Sure.

( P A U S E )

MS. GOLDFRANK: Can we mark this as a government exhibit?

(Whereupon, Government Exhibit No. 23 was marked.)

BY MS. GOLDFRANK:

states."

Ms. Peters: "Okay."

Ms. Santos: "And based on their reorders, we know that the average store is selling at least two pairs of earrings per day." Is that true?

A. I don't know.

Q. How would Ms. Santos know?

A. I don't know.

Q. "Now, you remember your net profit is $4.25 on every sale, right?"

Ms. Peters: "Right."

Miss Santos: "Now, if you multiply $4.25 times two sales per day, that comes out to $8.50. Now, that's your profit for one day at one store. Now, if you just did a minimum of two sales per day and you have 30 accounts, so multiply $8.50 times 30 and that comes out to 255 net profit for the day, so 255 a day times, say, six days a week, comes out to $1,530 a week. Now, that's over..."

Ms. Peters: "Wait, let me slow down. $255 profit per day?"

Ms. Santos: "Yes."

Ms. Peters: "Okay."

Ms. Santos: "And in a week it would be $1,530."

in the marketing material. Based on the presumption that two sales a day will occur at your locations, this is the math.

Q. What is the presumption that two days -- two sales a day will occur based on?

A. Based on the fact that if there's 48 pairs of earrings on a display sitting in a tanning salon that has 75 women walking in daily, odds are you're probably going to sell at least two pairs of earrings.

Q. And is that what the average location sells a day, two pairs of earrings?

MR. REID: Objection. You may answer.

A. I don't know what each and every location sells per day per state per distributor.

Q. Did Elite Designs provide potential investors with any documentation to substantiate any earnings potential claims made by sales representatives?

THE WITNESS: Any documentation?

MS. GOLDFRANK: Yes.

A. No.

Q. Did Elite Designs provide potential investors with any documentation to substantiate the earnings potential claims made in advertisements?

A. You asked me --
Q. I asked how long --
A. -- was he --
Q. -- Wattu --
A. -- was he the vice president and treasurer?
Q. Yes.
A. And I said all of two months, September and October.
Q. And then what happened?
A. Then he was -- I told him I don't want to do business with him anymore, at some point in October, and we probably didn't get to revising, you know, revising these articles of incorporation until maybe December or January of 2005 when I realized he was on the paperwork and I wanted nothing else to do with him, so I had it -- I'm almost positive I had it changed.
Q. And Ron was fired when?
A. In October of '04.
Q. Do you answer to anyone at the Designer Collection?
A. As far as --
MR. REID: Objection.
Q. Are you -- do you report to a Board of

Directors?

A. No.

Q. And as of today, you are the president, correct?

A. Yes.

Q. Vice president?

A. Secretary and treasurer, I believe.

Q. Do you own stock in the company?

A. Yes.

Q. How much?

A. 600 shares.

Q. And is that all of the stock?

A. Yes.

Q. Now, the Designer Collection, does it manufacture its own jewelry?

A. No.

Q. Where does it get the jewelry from?

A. I buy it from various resources, suppliers in Rhode Island, suppliers throughout the country, overseas. On occasion we will employ a list of subcontractors to produce certain styles for us. It's a mixture of resources that I get the jewelry from.

Q. Did the Designer Collection ever buy jewelry from Elite Designs?

telemarketers.

Q. And before that?

A. Before that it would have been Elite Designs.

MS. GOLDFRANK: I am going to hand you what has been marked as Government Exhibit No. 7.

A. Okay.

Q. Can you identify what this is?

A. Yes. This is the revised version of the franchise memorandum that Attorney Jonathan Neff comprised.

Q. When was this put together?

A. September of '04 it was completed.

Q. And was it put into the promotional packets in September of 2004?

A. Yes.

Q. Who was responsible within the company, meaning Designer Collection, for providing the information contained in this document?

A. I was.

Q. And what is the effective date of the memo?

A. This particular copy says January 10, 2005.

Q. But you would have earlier copies like

these?

A. Yes, I know there were.

Q. Is this the current version of the Designer Collection business opportunities disclosure memorandum?

A. Without reading every single word of it, I believe it is.

MS. GOLDFRANK: You can take your time and look at it if you want.

THE WITNESS: Yes. If you would turn to Page 3, for example No. 9, Jonathan Neff asked that we revise the verbiage being used in the money back guaranty to now state guaranteed refund for excess stock after 14 months.

Q. Now, this disclosure memorandum, it was included in the promotional -- in the pre-investment promotional material, is that correct?

A. Yes.

Q. Looking at the first page, which is Bates-labeled DES ED DOCS 55?

A. I'm sorry?

Q. It's the first page; it's on 55.

A. Okay.

Q. If you look to see number one, the Designer Collection, Incorporated and its

affiliates?

A. Uh-hum.

Q. And it says, "A. Company name: The name of the seller of the business opportunity is the Designer Collection, Incorporated (the Company.) The sole business of the company is marketing designer earrings and other related products through distributors.

"B. Founder and affiliates. Anthony Antonelli, the founder and owner of the Company, began business operations in 1990 when he formed Elite Designs, a jewelry manufacturing company. The Company was incorporated in Rhode Island in 1995 and continues to do business under the name Elite Designs, Incorporated."

Now, the Company, does that refer to the Designer Collection?

A. There it's referring to me and Elite Designs because I am the founder and an affiliate of mine is Elite Designs.

Q. Earlier on the company is defined as the Designer Collection, Incorporated, is that correct?

A. I'm sorry?

Q. Earlier you defined or the document defines the company --

A. Right.
Q. -- as the Designer Collection, Incorporated.
A. Right, but it's my understanding from Attorney Neff you must disclose the founder of the company and any affiliates that he is in control of or associated with which is what he did in "B."
Q. Okay. The company there refers to Elite Designs?
A. Correct.
Q. Turning to the next page, which is Page Bates-labeled 56, category No. 3, it's titled Litigation and Bankruptcy.
As of January 10, 2005, the effective date of this document, is the litigation history information provided true?
A. I don't know if I was named in the suit or the complaint from Liz Claiborne or not, but if I was, then this first statement is not true but if it was just Elite Designs only, which I think it was, I would say that this is accurate.
Q. What about the cease and desist order that was issued in South Dakota?
A. I don't think that can be termed litigation, do you?

MR. REID: She gets to ask the questions, not you.

THE WITNESS: I'm sorry.

MR. REID: Actually, looking at the caption of the order to cease and desist and refrain and opportunity to request hearing, the -- the entities identified there are Elite Designs, Inc., ExpresScents, Inc., also known as Designer Scents. It does reference Anthony Antonelli, Ron Wattu, Erica Roberts, and all officers, directors, brokers, agents, and employees thereof.

BY MS. GOLDFRANK:

Q. Turning back to Exhibit No. 1, do you have Exhibit No. 1? Turning to Bates-labeled ED 267.

A. Okay.

Q. Looking at -- is this the disclosure document included in the Designer Collection pre-investment promotional package? I'm talking about ED 267.

A. At which time?

Q. Well, when was this sent out?

A. This was sent out prior to September of '04.

Q. Okay. Looking at the litigation history section, which is 436.1(A)4, the document says:

Neither Elite Designs, Incorporated, the Designer Collection nor Anthony Antonelli;

(A) Has at any time previous the previous seven fiscal years been convicted of a felony, et cetera;

(B) Has at any time during the previous seven fiscal years been held liable in a civil action resulting in a final judgment, et cetera;

(C) Is subject to any currently effective state or federal agency or court injunctive or restrictive order or is a party to a proceeding currently pending in which such order is sought, relating to or affecting business opportunity activities or the seller/customer relationship, or involving fraud, including violation of any business opportunity law or misappropriation of property, or restraint of trade.

Now, comparing Exhibit 1, the disclosure document in Exhibit 1, to the disclosure document in Exhibit 7, why wasn't all of the information that was disclosed in Exhibit 1 disclosed in the disclosure document included -- marked as Exhibit 7?

MR. REID: Objection. You may answer.

A. Because Attorney Neff took Exhibit 1 and edited it and revised it to what he felt was acceptable under present times, conditions and

provided me with this version which is Exhibit 7.

Q. Are you subject to any currently effective state or federal agency or court injunctive or restrictive order relating to or affecting business opportunities?

MR. REID: Objection. Would you please identify who do you mean by you, and secondly, put a time frame on it.

MS. GOLDFRANK: Sure.

Q. Are you currently, meaning today, and by you I mean you, Anthony Antonelli, subject to any effective state or federal agency or court injunctive or restrictive order relating to or affecting business opportunity activities?

A. There is a civil investigative request by the Attorney General of the State of Rhode Island on my behalf, and there has been a lawsuit or a complaint filed from Treasure Enterprises and this current complaint came after this documentation.

Q. Okay. Are you under a cease and desist order, you personally Anthony Antonelli, in South Dakota?

A. Yes.

Q. Why is that information not listed?

A. It was simply an oversight.

MR. REID: Amy, for clarification, if I may, did you ask the effective date of Government Exhibit 7?

MS. GOLDFRANK: I did. I believe -- if not, what is the effective date of -- I may not have.

Q. What is the effective date --

MR. REID: I'm sorry, you did. It's January 10 of '05.

THE WITNESS: No. But we actually implemented in September of '04. This particular copy has that date on it.

MR. REID: Thank you.

Q. Turning to Bates-labeled 58, and again we are looking at Government Exhibit No. 7, category No. 13, the title is Information Regarding Existing Distributors, the document provides that the company currently has 89 distributors operating in 21 states. First of all, is that true?

A. I don't know if it's true, if it's entirely true to which corporations. I know -- I know between all of the entities I currently have close to 600 distributors, so I'm not sure if this is a -- if this is the disclosure for the Designer Collection specifically and only, it is not true.

Q. And you provided this information to your attorney?

A. I'm not sure where that number -- those numbers came from. I don't believe I supplied him these numbers.

Q. Did your attorney speak to anyone else at the company?

A. He may have.

Q. Is he authorized to speak to anyone else at the company?

A. Yes.

Q. Who?

A. John Centracchio.

Q. So besides yourself, the only other person who may have provided your attorney with information for this document is John Centracchio?

A. Correct.

Q. And what is his role at the Designer Collection?

A. Similar to his role at Country Kitchen Candles where he assists me in certain areas like these in marketing new material, getting new product, shipping, meeting with various people to put all this together, and on occasion I've been out of the office and have left instructions if Attorney

Neff were to call and needed a question answered, he should call -- he should ask for John Centracchio.

Q. Now, under category 13, why weren't the names, addresses and phone numbers of existing distributors provided?

A. If they're not in here, it would be my understanding that Attorney Neff didn't think that they needed to be in here.

Q. Do you remember having -- I'm not asking about the contents but do you remember having a conversation with your attorney about this --

MR. REID: Objection.

Q. -- specifically --

MR. REID: I'm sorry. I didn't mean to interrupt.

Q. -- specifically about category 13, Information Regarding Existing Distributors?

MR. REID: Objection. On the subject of -- of category 13 without asking any of the particulars, you may -- objection; you may answer.

A. I don't recall any.

MR. REID: Without disclosing anything you may have said to your attorney or that Mr. Neff -- or that Mr. Neff may have said to you.

A. I don't recall a specific conversation

regarding No. 13 on Exhibit 7.

Q. I'm going to hand over Government Exhibit No. 17.

MR. REID: Would this be a good point to take a short break?

MS. GOLDFRANK: Sure.

MR. REID: Also how much more do you have to go?

MS. GOLDFRANK: Timewise? How much time do I have? Off the record.

(Off-the-record discussion.)

(Resumed at 3:48 p.m.)

BY MS. GOLDFRANK:

Q. I am going to hand you what's been marked as Government Exhibit No. 17. Do you recognize this?

A. Yes.

Q. What is it?

A. This is the distributor agreement that Attorney Neff constructed on my behalf for the company.

Q. When has this been in use?

A. Since September of '04.

Q. Looking at the first page, Bates-labeled 62, under Additional Duties of Company, do you see

MR. REID: If I don't in the next couple of days, I'm not ignoring you. Just remind me.

MS. GOLDFRANK: Sure. No problem.

BY MS. GOLDFRANK:

Q. Does the Designer Collection advertise in newspapers around the country?

A. Did they or do they? I'm not sure what you want.

Q. Do they?

A. No longer, no.

Q. Did they?

A. Yes.

Q. When did they?

A. From September '04 to probably March or April of '05.

Q. And why did the Designer Collection stop advertising?

A. For lack of revenue.

MS. GOLDFRANK: Off the record.

(Off-the-record discussion.)

THE WITNESS: If I may expand on my last answer.

MS. GOLDFRANK: Sure.

THE WITNESS: And also due to this complaint filed by the U.S. Government, it was not a

conducive business environment for me to continue to offer them, so I made an internal decision to stop offering them.

Q. Turning back briefly to Government Exhibit No. 8, turning to the second page where it's Bates-marked 355, whose signature is that at the bottom, if you know?

A. It may be John Centracchio's but I'm not certain.

Q. And does he still work for the Designer Collection?

A. No.

Q. When did he stop working for the company?

A. I would say two months ago when essentially the operation was basically nonexistent so there was -- there are times when he can assist in an existing distributor situation because he's got -- he has knowledge of their case and their files.

Q. He wasn't fired?

A. Excuse me?

Q. He wasn't fired?

A. No.

Q. I'm going to hand over Exhibit No. 6. Do you recognize this?

A. Yes.
Q. Is that a complete -- what is it?
A. It appears to be the sales pitch that is read to a prospective distributor of earrings.
Q. Do you know which company the script is on behalf?
A. I believe it's a collaboration of the two companies, Pro-tech Marketing and Discount Vending, because that's who was in charge of this sales pitch.
Q. What was the sales pitch for, what company?
A. Designer Collection.
Q. Designer Collection, Incorporated or not?
A. I'm not sure exactly. It was probably used in each of the entities.
Q. Now, you said that you recognize this?
A. Yes.
Q. Did you review this before it was used?
A. Initially I did but Ron Wattu was the one who devised it and altered it at times or said he's going to change the pitch or alter the pitch. I basically, you know, just said okay. I didn't -- I didn't review it each and every time that he made changes to it.

Q. Well, looking at Government Exhibit 6, did you review this version of this script?

A. At some point in time, I'm sure I did.

Q. And would you have okayed it?

A. For the most part, I would.

Q. For what part, if any, wouldn't you have?

A. I'd have to read through it.

Q. Do you want to take --

A. If you'd like me to, I would.

MS. GOLDFRANK: Sure.

MR. REID: Just for the record, I note that the copy that I have appears to have gaps.

MS. GOLDFRANK: That's the way I got it from you.

MR. REID: I know and I don't know if -- it almost looks like there may have been a Post-it note or something covering part of a word or a word and some other words. I'm not --

MS. GOLDFRANK: If you can get me a clean one, I'll be happy to look at that.

MR. REID: But this is what Anthony gave to me and that's why I gave it to you and this is the condition it was in when I got it, so if we find a complete -- I just wonder if this happened during the photocopying.

No, I know that it didn't because I went back when I saw -- after the copies were made, and I saw what appeared to be a missing word, I went back and looked at the documents that we sent out to be photocopied and that's what it looked like.

(Witness reading document.)

A. Okay.

Q. Is there any part of this script that you had not reviewed before -- strike that.

Do you recognize all of the script?

A. Yes.

Q. Did you review this version of the script --

A. Yes.

Q. -- before it was used?

A. Yes.

Q. Approximately when was this script in use?

A. Probably in all of '04 and some of '05.

Q. Who actually wrote the sales pitch?

A. I believe it was Ron Wattu with assistance from John McDonald.

Q. Was any training provided to the telemarketers as to how to use the script?

A. By those two individuals I believe, yes.

Q. How do you know that?