UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ELITE DESIGNS, INC., a Rhode Island corporation, and<br><br>THE DESIGNER COLLECTION, INC., a Rhode Island corporation, and<br><br>ANTHONY ANTONELLI, individually and as an officer of the corporations,<br><br>Defendants. | C.A. NO. 05-058-S |

**PLAINTIFF UNITED STATES' REPLY TO DEFENDANTS' OBJECTION TO PLAINTIFF'S MOTION TO COMPEL DEFENDANTS TO PRODUCE DOCUMENTS AND SUPPLEMENT INCOMPLETE INTERROGATORY ANSWERS**

On October 3, 2005, Plaintiff, the United States of America, filed a Motion to Compel Defendants Elite Designs, Inc., The Designer Collection, Inc., and Anthony Antonelli to Produce Documents and Supplement Incomplete Interrogatory Answers. The government sought recourse to the Court only after its letters of July 22, 2005, September 9, 2005, and September 15, 2005, went unanswered. See Exhibits C through E attached to United States' Memorandum of October 3, 2005. The government replies to Defendants' Objection to Plaintiff's Motion to Compel, and Defendants' Memorandum filed on October 17, 2005, as follows:

Defense counsel's account of the Rule 16 Conference is not consistent with the

government's understanding of what occurred. At the Rule 16 Conference, defense counsel argued that defendants do not fall within the ambit of the Federal Trade Commission's Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures ("Franchise Rule"), 16 C.F.R. Part 436. Defense counsel stated that defendants are not franchises because territorial restrictions are not placed on the jewelry distributors.[1] As a result of defense counsel's argument, Judge Smith told the government to refrain from sending financial discovery until the government is confident that defendants fall within the Franchise Rule. The Judge reasoned that if defendants are not in fact franchises, financial discovery becomes moot.[2]

Judge Smith urged the parties to use the first ninety days to conduct an intensive exchange of documents and acknowledged that if defendants are within the Franchise Rule, the government is entitled to financial disclosures. Judge Smith closed the Rule 16 Conference by ordering a settlement conference to be held in ninety days. The government does not believe that Judge Smith directed the parties to schedule a status conference to discuss the prospect of financial discovery after the parties completed all non-financial discovery.

As to the specific requests and interrogatories at issue–

**Financial Interrogatories and Requests** (Interrogatory No 1. to Antonelli, Request No. 1 to Antonelli, Interrogatory No. 3 to Elite Designs & Designer Collection, and Request No. 4 to Elite Designs & Designer Collection): The government is entitled to the requested financial

---

[1] An irrelevant fact under the Franchise Rule.

[2] As noted in the government's Memorandum of October 3, 2005, the government possessed evidence from the pre-complaint investigation that demonstrates defendants' businesses meet the three conditions that make a business a franchise within the Franchise Rule.

information. Discovery in this case is not bifurcated. The government thus must obtain all necessary financial information during the regular course of discovery. Since ability to pay is a factor that the Court must consider in formulating a civil penalty, and Defendant Antonelli testified under oath that he could not pay $700,000 in redress and $600,000 in civil penalties, the government must obtain all relevant financial documents now. A substantial civil penalty is warranted especially in a case such as this where the defendants used phony references who touted the franchise to prospective investors. See United States' Memorandum of October 3, 2005, at 9-10; Defendant's Memorandum at 7, Paragraph E. Thus, the defendants should be compelled to disclose the requested financial information.[3]

**Interrogatory Requesting the Identification of All Litigation, Including Cease and Desist Proceedings,** (No. 2 to Elite Designs & Designer Collection): The government is merely requesting that defendants disclose all relevant litigation. While the government discovered on its own initiative an undisclosed Order to Cease and Desist, such information should have been revealed by the defendants. The government is entitled to a complete list of relevant litigation and all relevant documents. Defendants still have not stated definitively that all relevant litigation has been identified to the government.

**Interrogatory Requesting the Identity of All Persons Authorized by the Company to Make Earnings Claims** (No. 8 to Elite Designs & Designer Collection) and **Interrogatory Requesting the Identity of All Employees, Agents, Representatives** (No. 21 to Elite Designs

[3] Defendants object to the time period covered by the financial interrogatories and document requests, stating that defendants' franchise businesses did not start until the spring of 2003. Ability to pay is not limited to the earnings defendants made from their illegal enterprises. See e.g., United States v. Danube Carpet Mills, Inc., 737 F.2d 988, 994-95 (11th Cir. 1984). Thus, pre-2003 financial information is relevant.

& Designer Collection): The assertion that defendants are unable to identify their sales representatives and agents simply is inaccurate or at least vastly overstated. Defendant Antonelli testified at his deposition that he is aware that John McDonald performed sales work, see exhibit 1 at 46-47, he believes Erica Roberts was a telemarketer,[4] see exhibit 1 at 60, he admitted that Nick Schofield was a telemarketer, see exhibit 1 at 60, he believes Diane Thompson was a telemarketer, see exhibit 1 at 98, he knows Kim Rushford did work for The Designer Collection, see exhibit 2 at 15, 19, and he identified John Timblin as a salesman for The Designer Collection, see exhibit 2 at 58. Defendant Antonelli should be able to identify who worked for him and his companies as defendants paid the sales representatives and so-called "independent contractors" for the work they performed on defendants' behalf. See Exhibit 1 at 54, 75, 82, 98, 184-185. In fact, several of the sales representatives worked at 9 Thelma Avenue in a facility adjacent to defendants' workplace. See Exhibit 1 at 62, 66. Defendants' claims of inability to identify sales people are not credible. This Court should compel defendants to identify all responsive names previously not identified.

**Interrogatory Requesting Identity of Every Name Given to an Investor as a Reference** (No. 17 to Elite Designs & Designer Collection) and **Document Request for Payments Sent to References** (No. 24 to Elite Designs & Designer Collection): Madeline Wagner, a former sales representative, testified under oath that she received payments from Defendant Antonelli, not Ron Wattu, for her work as a reference. See Exhibit J attached to United States' Memorandum of October 3, 2005. Furthermore, the use of phony references was

---

[4] Erica Roberts was also named in the Order to Cease and Desist that defendants failed to disclose.

rampant and any argument that defendants were unaware of the use of bogus references is untenable. Telemarketers who worked at the telemarketing room at 9 Thelma Avenue and John McDonald, whom defendants identify in their initial disclosures as Telemarketing Director, gave potential investors the names of phony references. Defendants should be compelled to disclose all known references and all payments made to the references.

**Interrogatory Requesting Identification of All Expert Witnesses** (No. 15 to Elite Designs & Designer Collection): The government asks that defendants identify who they intend to call as expert witnesses or, in the alternative, that the Court set a time for the orderly disclosure of expert witnesses as no such date exists in the Pre-Trial Order issued by the Court .

**Document Request for All Contracts with Telephone Companies and All Telephone Bills** (No. 18 to Elite Designs & Designer Collection): Defendants' agree in their Memorandum that to the extent the government is willing to limit this request to calendar year 2004, defendants will produce such records. The government limited the request to calendar year 2004 in its July 22, 2005 letter to defendants. See Exhibit C attached to United States' Memorandum of October 3, 2005. The Court should order such disclosure.

For the aforementioned reasons, the government respectfully requests that its Motion to Compel Defendants Elite Designs, Inc., The Designer Collection, Inc., and Anthony Antonelli to Produce Documents and Supplement Incomplete Interrogatory Answers be granted.

Respectfully Submitted,

UNITED STATES OF AMERICA

PETER D. KEISLER, JR.
Assistant Attorney General, Civil Division
United States Department of Justice

EUGENE M. THIROLF, Director
Office of Consumer Litigation

AMY E. GOLDFRANK, Trial Attorney
Office of Consumer Litigation
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20044
202 307-0050
Fax: 202 514-8742

ROBERT CLARK CORRENTE
United States Attorney

LISA DINERMAN Bar #2689
Assistant United States Attorney
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903
401 709-500
Fax: 401 709-5017

**CERTIFICATE OF SERVICE**

I hereby certify that the aforementioned "Plaintiff United States' Reply to Defendants' Objection to Plaintiff's Motion to Compel Defendants to Produce Documents and Supplement Incomplete Interrogatory Answers" was sent from the Office of Consumer Litigation, Department of Justice, Washington, D.C. via regular mail on October 21, 2005, to:

Stephen J. Reid, Jr.
Blish & Cavanagh, LLP
Commerce Center
30 Exchange Terrace
Providence, Rhode Island 02903

Attorney for Defendants Elite Designs, Inc., The Designer Collection, Inc. and Anthony Antonelli

Amy E. Goldfrank

# EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>Plaintiff | : | |
| VS. | : | C.A. NO. 05-058-ML |
| ELITE DESIGNS, INC., a Rhode Island Corporation, and ANTHONY ANTONELLI, individually and as an officer of the corporation<br>Defendants | : | |

Deposition of ANTHONY ROCCO ANTONELLI, the Defendant herein, taken on behalf of the Plaintiff, on THURSDAY, JULY 28, 2005, 9:10 A.M., at the offices of the United States Attorney, Fleet Center, 50 Kennedy Plaza, Providence, Rhode Island, before Vivian S. Dafoulas, Registered Merit Reporter/Certified Realtime Reporter.

Vivian S. Dafoulas, RMR-CRR

50 Fieldstone Drive

East Greenwich, RI 02818-2064

(401) 885-0992

employees?

A. Currently no one.

Q. Are you familiar with the name John McDonald?

A. Yes.

Q. Who is he?

A. He is a sales representative.

Q. For whom?

A. For his company, Discount Vending.

Q. How do you know him?

A. He's done some work for us.

Q. What type of work did he do for you?

A. Sales.

Q. For what company?

A. For, I believe, Country Kitchen Candles, the Designer Collection, and Elite Designs.

Q. Was he an employee of yours?

A. No.

Q. What was he?

A. An independent contractor.

Q. What's the difference between an employee and an independent contractor?

MR. REID: Objection. Calls for a legal conclusion.

BY MS. GOLDFRANK:

Q. What is your understanding is the difference between an employee and independent contractor?

MR. REID: Objection. You may answer, if you know.

A. In my eyes, an employee is someone who works specifically for the company, has certain responsibilities, punches a time clock, reports to me, answers to me. An independent contractor is someone that you hire and you ask them to do something for you and pay them to do that, pay their company.

Q. Who hired John McDonald?

A. I believe -- I believe it was me.

Q. When was he hired?

A. I believe in '03.

Q. When did he leave?

A. I currently still use John McDonald. Well, I haven't -- we haven't sold -- we stopped selling business opportunities about five or six months now, so I haven't really used him since then.

Q. Currently you -- and by you I mean Elite Designs -- all the candle companies, they are not selling business distributorships?

A. No.

A. I paid their corporations for a service.
Q. You hired their services?
A. Correct.
Q. And I was asking, it's my understanding that sales representatives -- there are other sales representatives besides John McDonald --
A. Yes.
Q. -- and Ron Wattu?
A. Yes.
Q. You were saying that John and Ron can hire these sales representatives?
A. Correct.
Q. And who paid for their salary?
A. Sometimes my corporations would pay for them and sometimes I believe their corporations would pay for them. They would come in to me and say, "We're going to hire six telemarketers, is that okay?"
And then we would pay the telemarketers from whatever corporation they were working for and I believe that's in the payroll records.
Q. When would John McDonald or Ron Wattu pay the telemarketers themselves?
A. I'm not sure.
Q. What percentage of the time do you think

Q. Are you aware of whether those companies are still in business?

A. I am aware that Discount Vending is. I have no idea about Pro-tech Marketing.

Q. Are you familiar with the name Erica Roberts?

A. It sounds familiar. I think at one time she was a telemarketer.

Q. Do you know who hired her though?

A. I would have to say I think it was John McDonald. I think she was in his telemarketing division.

Q. Are you familiar with the name Nicholas Schofield?

A. I believe he worked for Discount Vending or he was a telemarketer for me through Discount Vending, Nick Schofield.

Q. Do you know how long he worked as a telemarketer? Well, what company do you know he worked as a telemarketer for?

A. I think Country Kitchen Candles and I do not know how long.

Q. How about Erica Roberts, what company did she work for?

A. I believe the same.

A. Yes.
Q. Where did the telemarketers work from physically?
A. They worked in a location located next to Elite Designs at 9 Thelma.
Q. And when they came into work, who supervised them?
A. John McDonald and I guess Ron Wattu too because he had a role in how that room operated.
Q. Do you have any written agreements with Ron Wattu?
A. No.
Q. Any written agreements with Ron's company?
A. No.
Q. Do you have any written agreements with John McDonald?
A. No.
Q. Any written agreements with his company?
A. No. No.
Q. Are you familiar with the name Janet Hill?
A. Yes.
Q. Who is Janet?
A. Janet is our customer service representative.
Q. For which company?

A. Mary is, you know, administrative officer for me who gets paid by Elite Designs.

Q. Did you hire Mary?

A. Yes.

Q. Are you familiar with the name Phyllis Rossi, R-O-S-S-I?

A. Phyllis sounds familiar. I think at one time there was a Phyllis in John McDonald's telemarketing room.

Q. Do you know who hired Phyllis?

A. John McDonald.

Q. You are not sure what Phyllis did?

A. I believe she was a telemarketer but I'm not sure about her exact responsibilities.

Q. You mentioned the telemarketers made their calls from 9 Thelma Avenue?

A. Yes.

Q. Who paid rent for 9 Thelma Avenue?

A. I did. Elite Designs did.

MS. GOLDFRANK: Let me ask you a few more names and then if you want to take a brief break, is that okay?

MR. REID: Sure. If that works for you, it works for us.

BY MS. GOLDFRANK:

conversation?

MS. GOLDFRANK: Sure.

A. I have no idea if I could have recorded his conversations.

Q. Now, Ron's telemarketers worked at 9 Thelma Avenue, is that correct?

A. No. Ron had telemarketers working for him up in Massachusetts.

Q. Who worked at 9 Thelma Avenue?

A. John McDonald's telemarketers which went under the name of Discount Vending. His company, I -- his company worked at 9 Thelma along with the telemarketers that I agreed to pay.

Q. Did you ever agree not to pay for a telemarketer?

A. No.

Q. Who paid for the space up in Massachusetts for the telemarketers up there to make --

A. It's my understanding that they all worked from their home. The people that Ron Wattu hired to work in the telemarketing division for him, I believe were at-home people.

Q. Was it your understanding that only Ron was making misrepresentations or what about his -- what about the telemarketers who were working from

to how many hours he worked. He was -- he was paid on a percentage basis like John McDonald had Discount Vending.

Q. Were telemarketers also paid on a percentage basis?

A. In addition to their hourly wage, if they were part of a deal that came into the company.

Q. What was their hourly wage?

A. I believe it was, you know, $7.50, $8 an hour.

Q. And that came out of which bank account?

A. Whatever company they had bought the deal from, whether it be Country Kitchen Candles, ExpresScents, Designer Collection.

Q. What did the telemarketers get if someone -- if a distributor they spoke to actually invested?

A. I'm not sure of the exact amount. I believe it was either half a percent or 1 percent of the purchase price.

Q. And was that true for all telemarketers who worked for any of your companies?

MR. REID: Objection. You may answer.

A. I believe so.

Q. Did Ron Wattu, did he work for any other

you recall what reference you and Ron were meeting about?

A. No, I do not.

Q. I'm going to throw out some names and see whether you recognize any of them. Diane Thompson.

A. I believe she was a telemarketer for Ron Wattu.

Q. Who hired Diane?

A. Ron.

Q. Who paid for Diane?

A. One of the entities of mine.

Q. Do you know was -- who could fire the telemarketers?

MR. REID: Objection. You may answer.

A. Because I had no relationship at all with any of those, any of the telemarketers that Ron Wattu worked with, I would say that he would. They were people that he hired and I paid because they worked for -- under his supervision up in Massachusetts.

Q. Are you aware that Diane Thompson served as a distributor reference?

A. I'm not sure if it's Diane Thompson that someone brought to my attention was being used as a distributor reference or another individual who I

Q. Did the Designer Collection -- well, does the Designer Collection have sales representatives?

MR. REID: Does it now have sales representatives?

MS. GOLDFRANK: Yes.

MR. REID: Thank you.

A. No, it does not.

Q. Did it ever?

A. Yes.

Q. Who were the sales representatives?

A. Discount Vending.

Q. Who owns Discount Vending?

A. John McDonald.

Q. And when did Discount Vending work for the Designer Collection?

A. I believe it was in -- when we terminated our relationship, when Elite Designs terminated its relationship and the Designer Collection's relationship with Ron Wattu's company, John McDonald took over all sales.

Q. And who paid -- who paid the telemarketers for -- the telemarketers who called on behalf of the Designer Collection?

A. During the period the Designer Collection was incorporated, the Designer Collection paid the

telemarketers.

Q. And before that?

A. Before that it would have been Elite Designs.

MS. GOLDFRANK: I am going to hand you what has been marked as Government Exhibit No. 7.

A. Okay.

Q. Can you identify what this is?

A. Yes. This is the revised version of the franchise memorandum that Attorney Jonathan Neff comprised.

Q. When was this put together?

A. September of '04 it was completed.

Q. And was it put into the promotional packets in September of 2004?

A. Yes.

Q. Who was responsible within the company, meaning Designer Collection, for providing the information contained in this document?

A. I was.

Q. And what is the effective date of the memo?

A. This particular copy says January 10, 2005.

Q. But you would have earlier copies like

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Plaintiff | : |
| VS. | : C.A. NO. 05-058-ML |
| ELITE DESIGNS, INC., a Rhode Island Corporation, and ANTHONY ANTONELLI, individually and as an officer of the corporation<br>Defendants | : |

**VOLUME II**

Continued deposition of **ANTHONY ROCCO ANTONELLI**, the Defendant herein, taken on behalf of the Plaintiff, on WEDNESDAY, SEPTEMBER 21, 2005, 10:00 A.M., at the offices of the United States Attorney, Fleet Center, 50 Kennedy Plaza, Providence, Rhode Island, before Vivian S. Dafoulas, Registered Merit Reporter/Certified Realtime Reporter.

ORIGINAL

Vivian S. Dafoulas, RMR-CRR
50 Fieldstone Drive
East Greenwich, RI 02818-2064
(401) 885-0992

A. No. Maybe in -- I don't -- maybe in late '04 after myself and Ron split.

Q. And what type of contact did you have?

A. Just that anybody associated with Ron was no longer -- needs to go with him and not be associated with me.

Q. And so the time period is --

A. I would say November or December of last year.

Q. Do you know Mr. Match by any other name?

A. No.

Q. Are you familiar with an individual by the name of Kim Russford (phonetic)?

A. It's Rushford.

Q. Okay. Who is she?

A. Ron Wattu's girlfriend.

Q. Okay. Did she work for -- as an agent for the Designer Collection?

MR. REID: Objection.

A. She may have.

Q. You don't know if she did?

A. I'm not sure if she worked at all for the Designer Collection but she worked for some of the other entities.

Q. How about Elite Designs?

with Ron Wattu ended, which was in October of '04.

Q. Now, did Miss Rushford do work on behalf of the Designer Collection?

A. I believe she did some work. A small percentage of work was done for that entity by Miss Rushford.

Q. And how do you know that?

A. The payroll records.

Q. Your payroll records?

A. Right.

Q. Meaning Designer -- or one of your other entities?

A. I can simply go back and check those records to see who was paid.

Q. Now, you mentioned in your deposition on July 28th that Mitch Centracchio and John Centracchio were the same person?

A. Correct.

Q. Why does he go by two names?

MR. REID: Objection. If you know. Is it a nickname?

A. It's a nickname.

Q. Did Mr. Centracchio ever pretend that Mitch and John were different individuals?

MR. REID: Objection.

Q. So did both John and Ron report to you?

A. Well, occasionally we would have, you know, a meeting with the three of us where things would get discussed but as far as reporting, I would say no.

Q. So Ron could write whatever script he wanted to and just tell the sales representatives to use it without showing that to you?

A. Yes.

Q. Did he ever do that?

A. Yes, he did.

Q. And that was okay?

A. No. I -- I had, you know, I didn't have knowledge of him changing things where he was doing, you know, things incorrectly.

Q. So he was supposed to show you the sales scripts?

A. Yes, especially if he -- if he went ahead and changed something that I had previously reviewed or approved.

Q. Do you know an individual by the name of John Timblin?

A. It sounds familiar to me. I believe he's -- he works with John McDonald as some type of a salesman for the Designer Collection, I believe.