UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ELITE DESIGNS, INC., a Rhode Island corporation, and<br><br>THE DESIGNER COLLECTION, INC., a Rhode Island corporation, and<br><br>ANTHONY ANTONELLI, individually and as an officer of the corporations,<br><br>Defendants. | C.A. NO. 05-058-S |

**UNITED STATES' MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY**

Plaintiff, United States, pursuant to Fed. R. Civ. P. 56, hereby submits this Motion for Summary Judgment as to Liability as to Defendants Elite Designs, Inc., The Designer Collection, Inc., and Anthony Antonelli. Submitted contemporaneously with this Motion are a Memorandum in Support of United States' Motion for Summary Judgment as to Liability and United States' Statement of Undisputed Facts.

WHEREFORE, the United States respectfully moves this Court to find that defendants Elite Designs, Inc., The Designer Collection, Inc., and Anthony Antonelli violated § 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a) and the Franchise Rule.

Respectfully submitted,

UNITED STATES OF AMERICA

PETER D. KEISLER, JR.
Assistant Attorney General
Civil Division
U.S. Department of Justice

EUGENE M. THIROLF
Director
Office of Consumer Litigation

AMY E. GOLDFRANK, Trial Attorney
Office of Consumer Litigation
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20044
202 307-0050
Fax: 202 514-8742

ROBERT CLARK CORRENTE
United States Attorney

ROBIN E. FEDER
Assistant United States Attorney
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903
401 709-5000
Fax: 401 709-5017

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ELITE DESIGNS, INC., a Rhode Island corporation, and<br><br>THE DESIGNER COLLECTION, INC., a Rhode Island corporation, and<br><br>ANTHONY ANTONELLI, individually and as an officer of the corporations,<br><br>Defendants. | C.A. NO. 05-058-S |

**MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY**

## I. Introduction

Plaintiff, United States, submits this Memorandum in Support of its Motion for Summary Judgment as to Liability pursuant to Fed. R. Civ. P. 56. The United States brought this action against Elite Designs, Inc., (Elite Designs), a Rhode Island corporation, The Designer Collection, Inc., (The Designer Collection), a Rhode Island corporation, and Anthony Antonelli, Elite

Designs' and The Designer Collection's President, Vice-President, Secretary, and Treasurer for violations of § 5(a) of the Federal Trade Commission Act (the FTC Act), 15 U.S.C. § 45(a).[1] The United States' Complaint alleges three violations of the Franchise Rule. First, defendants failed to provide an accurate and complete "basic disclosure document" to potential purchasers. 16 C.F.R. § 436.1(a). Second, defendants failed to have a reasonable basis for their representations about sales, income, and profits, failed to disclose that materials which constitute a reasonable basis for such claims are available, and failed to disclose the material bases and assumptions upon which such claims are made in a separate "earnings claim document." 16 C.F.R. §§ 436.1(b)(2)-(3) and (c)(2)-(3). Third, defendants failed to disclose the number and percentage of franchisees it knows to have done as well or better than the earnings claim made in defendants' advertisements. 16 C.F.R. § 436.1(e)(3). Because there are no genuine issues of material fact in dispute relating to the issues of coverage of the Franchise Rule and whether the defendants violated the Franchise Rule, summary judgment is appropriate to resolve these issues.

## II. Background On The Franchise Rule

Frequently consumers who have never run a business consider acquiring a small business to supplement their income, or as a source of income when they become unemployed. The allure of a "franchise" to such people is that the franchisor offers a "pre-packaged" business, a formula

---

[1] Pursuant to the FTC Act, the FTC promulgated a Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures" (the "Franchise Rule"), 16 C.F.R. § 436.2(a). Pursuant to § 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), and 16 C.F.R. § 436.1, violations of the Franchise Rule constitute unfair or deceptive acts or practices in or affecting commerce, in violation of § 5(a) of the FTC Act, 15 U.S.C. § 45(a).

for success, which promises the would-be entrepreneur sufficient support, expertise, and assistance with which the person believes he or she can pursue the business successfully. The Franchise Rule requires that where those promises of support are made, the consumer must also be given certain disclosures so that they can protect themselves by verifying the sales claims. Simply put, in this Memorandum the United States demonstrates that the defendants have made the type of promises, and offered the sort of business relationship, that trigger the protections of the Franchise Rule, but failed to provide the disclosures that the Franchise Rule requires. As a result of these violations, consumers were unable to learn that defendants' claims were unsubstantiated and downright false.

Basic Disclosure Document: The Franchise Rule requires a franchisor to provide prospective franchisees with a complete and accurate basic disclosure document containing twenty categories of information, including information about the history of the franchisor, the terms and conditions under which the franchise operates, and information about other franchisees. 16 C.F.R. § 436.1(a)(1) - (20). For example, the disclosure statement must include the names, addresses and telephone numbers of (1) the ten franchised outlets of the franchise business nearest to the prospective franchisee, (2) all franchisees, or (3) all franchisees in the state where the prospective franchisee lives or where the proposed franchise is to be located, provided there are more than ten such franchisees. 16 C.F.R. § 426(a)(16). Providing the names and telephone numbers of such individuals allows a prospective investor the opportunity to call franchisees regarding the franchise and to verify the sales claims. The disclosure statement also must identify whether any of the franchisor's current officers and directors is subject to any

currently effective state injunctive or restrictive order relating to franchise activities or involving fraud. 16 C.F.R. § 436.1(a)(4). Such disclosure allows a prospective franchisee to learn of possible sharp or fraudulent practices by the seller. Defendants failed to provide a complete and accurate basic disclosure statement to prospective purchasers, in that defendants' disclosure document omitted critical information in both of these crucial areas.

Earnings Claims Disclosures: Where a seller makes oral or written earnings claims as part of its sales presentation, it must provide potential purchasers with an earnings claim document providing sufficient substantiation for the claims to allow purchasers to assess the reasonableness and typicality of the claims. Specifically, the Franchise Rule requires: (1) that the franchisor have a reasonable basis for any oral, written, or visual earnings or profit representations ("earnings claims") made by a franchisor or its employees or agents to a prospective franchisee, 16 C.F.R. § 436.1(b)(2), (c)(2); (2) that the franchisor, in immediate conjunction with such claims, disclose that materials which constitute a reasonable basis for such claims are available to the prospective franchisee, Id.; and (3) that the franchisor provide to prospective franchisees a document containing information substantiating the earnings claim (the "earnings claim document"), 16 C.F.R. § 436.1(b)(3), (c)(3). The earnings claim document must include information concerning the number and percentage of outlets that have earned at least the amount set forth in the claim, or a statement of lack of experience, as well as the beginning and ending dates of the time period covered by the claim. 16 C.F.R. § 436.1(b)(5).[2] Defendants

---

[2] See Federal Trade Commission v. Tashman, 318 F.3d 1273 (11th Cir. 2003), for a general (continued...)

lacked a reasonable basis for the earnings claims made, did not disclose that material substantiating such claims is available, and did not provide the required earnings claim document to prospective customers.

Earnings Claims in Advertisements: Where earnings claims are made "for general dissemination" in mass media, such as newspaper classified advertisements, the Franchise Rule requires the advertiser, in immediate conjunction with the claim in the advertisements, to include a disclosure of the number and percentage of franchisees it knows to have done as well or better than that claim 16 C.F.R. § 436.1(e)(3). Defendants did not provide the required earnings claims disclosures in their advertisements.

## III. Standards for Summary Judgment

Summary judgment is warranted if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Maturi v. McLaughlin Research Corp., 413 F.3d 166, 171 (1st Cir. 2005). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The moving party has the initial burden of establishing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). This burden may be satisfied by any kind of admissible evidence. Id. at 323. Once the moving party demonstrates that there

---

[2](...continued)
discussion of the issue of earnings claims violations in the context of the Franchise Rule.

are no genuine issues of material fact warranting trial, the non-moving party is required to produce evidence in opposition to the motion. Id. at 324. The substantive law of the case determines which facts are material and factual disputes that are irrelevant or unnecessary will not be counted.

To defeat a properly supported motion, an opposing party must provide evidence that there are issues of material fact that must be tried. See e.g., Federal Deposit Ins. Corp. v. Grupo Girod Corp., 869 F.2d 15, 16 (1st Cir. 1989). However, only genuine disputes of material facts are relevant. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (non-movant's evidence that some of a reporter's sources were unreliable deemed insufficient to establish a material issue of fact requiring trial in a libel case). It is not enough for the non-movant to offer evidence in opposition that is merely colorable or anything short of significantly probative. Cadle Company v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997) (citations omitted). "The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989).

The questions presented here are: (1) whether defendants sold a "franchise" as that term is defined in the Franchise Rule, (2) whether defendants violated the Franchise Rule, and (3) whether Anthony Antonelli is personally liable for the violations. Below, the Government

demonstrates that there are no genuine issues of material fact with respect to the foregoing questions and that the United States is entitled to judgment as a matter of law.

## IV. Defendants' Practices

Elite Designs and The Designer Collection[3] promoted and sold business opportunities. The opportunities included jewelry and display racks to showcase the jewelry, and promised the means to go into business selling jewelry. (Facts ¶¶ 3, 8, 15, 20).[4] The promise of the sales pitch was that the display racks would be "located" in existing retail outlets, and the distributor need only visit the sites weekly or every other week to restock the racks with fresh merchandise. (Facts ¶ 22 (c), (d), (k), (m)).

Anthony Antonelli is the President, Vice-President, Secretary, Treasurer, owner and sole shareholder of Elite Designs and The Designer Collection. (Facts ¶ 5). At all times material to this action, Antonelli formulated, directed, controlled or participated in the acts and practices of Elite Designs and The Designer Collection. For instance, Antonelli sat on Elite Designs' and The Designer Collection's jewelry distributor Selection Committee and possessed ultimate authority over who became a jewelry distributor; signed all of the Distributor Agreements entered on behalf of Elite Designs and The Designer Collection; paid Elite Designs and The Designer

---

[3] For the purposes of this Memorandum, any distinction, between Elite Designs and The Designer Collection is immaterial as both companies violated the Franchise Rule in the same manner and means.

[4] Plaintiff United States' Statement of Undisputed Facts will be referenced as "Facts" and will cite the paragraph in which the fact is set forth with evidentiary support.

Collection telemarketers; hired certain employees and agents;[5] approved and reviewed advertisements, sales scripts, and promotional material; rented and paid for a telemarketing room where several Elite Designs and/or The Designer Collection sales representatives sold business opportunities; met with potential jewelry distributors, spoke to existing jewelry distributors, and responded to consumer complaints and requests for refunds; determined if, and under what circumstances, a jewelry distributor was entitled to a discount or could amend the terms of the standard Distributor Agreement. (Facts ¶ 7). In fact, Antonelli admitted at his deposition that as President he possessed final authority over what occurred at Elite Designs and The Designer Collection. (Facts ¶ 7 (t), (u)).

Elite Designs and The Designer Collection advertised their business opportunities in newspapers throughout the United States. (Facts ¶ 9). An Elite Designs advertisement placed in several newspapers included a claim about the earnings purchasers could make if they invested in what was described as a Local Route. (Facts ¶ 10). The advertisement claimed that based on an investment of $12,950 purchasers could make $100,000 per year. (Id.). The advertisement provided interested readers with a toll-free telephone number to call for more information. (Id.). Likewise, an advertisement for The Designer Collection placed in several newspapers included a claim about the earnings purchasers could make if they invested in what was described as a Local Route. (Facts ¶ 12). The advertisement claimed that based on an investment of $9,950

---

[5] Defendants sometimes refer to their agents as "contractors."

purchasers could earn $100,000. (Id.) The Designer Collection's advertisement provided interested readers with a toll-free telephone number to call for more information. (Id.).

Consumers who called the toll-free telephone numbers were connected to Elite Designs' and The Designer Collection's sales representatives who made representations about the investment. In July and August 2004, two FTC investigators, posing as prospective customers, called the toll-free telephone number listed in a classified newspaper advertisement for Elite Designs. (Facts ¶ 14). The transcripts from these calls demonstrate that defendants' sales representatives made numerous claims and promises about the jewelry business venture. (Facts ¶ 20). Such statements included:

- The investment is a turnkey business – Elite Designs and The Designer Collection provide "[e]verything that you need to get you up and running fast." This includes "all the necessary paperwork to run your business, order forms, inventory and accounting forms. We also have a full-time customer service staff that is available to assist you during normal business hours . . . ." (Facts ¶ 20 (e), (g)).
- The mechanics of the business – Elite Designs and The Designer Collection "set you up in business and then you buy from us for years to come. That's how it works." (Facts ¶ 20 (h)).
- The ease of running an Elite Designs or The Designer Collection jewelry display rack distributorship –No sales are required because "[t]he product sells itself." To service your jewelry display racks "you'll simply visit each store once every two weeks to replace

the earrings that were sold," and "[w]e have found that you can easily service three accounts per hour including driving time . . . ." (Facts ¶ 20 (a), (d), (f)).

- A list of locating services is provided – "And one nice thing is, if you don't want to, you don't ever have to get the retail stores yourself. That can be done for you. You can actually hire a professional marketing company that specializes in retail product placement. We give you a list of about 10 to choose from." (Facts ¶ 20 (j)).
- The locating services are experienced – "[The locating services] place all types of products, like the ATM machines out there that you've seen. And when it's comes to placing your earrings, it's really just a matter of them contacting the existing account and telling them they'd like to introduce a new product. And when you're ready to get started, you'll get a list of stores who are waiting for the earrings. It's really just a matter of picking out the ones you like best." (Facts ¶ 20 (k)).
- The locating services are efficient and effective – "And a reason a lot of people like to use a [locating service] is because for most people, that's really the most expeditious way to get up and running." In fact, "[t]he locators can usually get all of your stores located within about a week. So, you can actually be up and running, making money, within about two weeks if you use a marketing company." (Facts ¶ 20 (l), (m)).
- Regarding finding locations on one's own – "You shouldn't have–you're not going to have any problem getting locations." Elite Designs and The Designer Collection assists customers who decide to find their own locations by providing "a complete training package. It includes a little presentation that's less than half a page long and you can

memorize it in five minutes." The presentation is "so good, no stores will refuse to sell your earrings." Thus, should you choose to forego the use of a locating service, "we're going to hold your hand and show you how to get your accounts on your own." (Facts ¶ 20 (p), (q), (r) (s)).

During the calls, the sales representative also made repeated claims about the earnings the undercover FTC investigators could anticipate if they invested in the advertised jewelry business opportunity. (Facts ¶ 21). Such earnings claims included:

- Earnings per week– Our jewelry distributors "usually start on a very part-time basis, about six or eight hours per week . . . . And they take home about $1,000 a week in net profit." (Facts ¶ 21 (a)).
- Earnings per week and year – "[W]e know [based on reorders] that the average store is selling at least two pairs of earrings per day." Based on a net profit of $4.25 per sale, two sales per day comes to $8.50. "Now, that's your profit for one day at one store. Now, if you just did a minium of two sales per day and you have 30 accounts, so multiply $8.50 times 30 and that comes out to $255 net profit for the day. So, $255 a day times, say, six days a week, comes out to $1,530 a week . . . . So, how does that sound to you so far? Well, $1,500 a week is over $75,000 a year, and all you have to do is service your accounts one day a week." (Facts ¶ 21 (b)).
- How long it takes to recoup the initial investment – "Now, most people make their investment back in three to four months." (Facts ¶ 21 (c)).

A sales script employed by Elite Designs and The Designer Collection sales representatives in 2004 and part of 2005, and approved by Antonelli, made the following earnings claims and statements, see Facts ¶¶ 22, 23:

- Earnings per week – "Our distributors usually start on a very part-time basis, about 6 or 8 *hours per week*–and some have built their business to the point where they take home *$1000.00 a week or more in net profit*." (emphasis in original). (Facts ¶ 22 (a)).
- Earnings per week and year –"Getting back to how you make your money: in a really good location, you can easily sell 3 to 4 pairs of earrings a day–but to be conservative, let's use an example of selling only 2 pairs a day on average (do you have a calculator handy?) You remember you make $4.45 on every sale right? (Make him get a calculator and/or write this down). If you multiple $4.45 times 2 sales per day, that comes out to $8.90. That's your profit for one day, at one store, if you just do [] 2 sales per day. You have 30 accounts, so multiply $8.90 times 30 and that comes out to $267.00 profit for the day. $267.00 a day times say six days a week comes out to $1,602 a week. Over $1500 a week! How's that sound to you _______ (WFA) and $1500 a week is over $75,000 a year! And all you have to do is service your accounts once day a week." (Facts ¶ 22 (d)).
- The investment is a no-lose situation – "You get a money back guarantee in writing which states that if you follow our marketing plan, and you don't make your full investment back within 14 months, we will buy back from you any earrings you have left from your original inventory–dollar for dollar." Because of the earring exchange policy

"**<u>you will definitely make money with this opportunity</u>**." (emphasis in original). (Facts ¶ 22 (f), (g)).

- "We manufacture hundreds of different styles of necklaces, bracelets, anklets, pins, charms and rings for many large companies such as *Liz Claiborne, Anne Klein and Monet* to name a few." (emphasis in original). (Facts ¶ 22 (h)).
- The investment is a turnkey business – "You get all of the necessary paperwork to run your business such as order forms, inventory and accounting forms. We also have a full customer service staff that is available to assist you during normal business hours." (Facts ¶ 22 (j)).
- The ease of running an Elite Designs or The Designer Collection jewelry display rack distributorship – "This requires <u>no</u> sales on your part whatsoever! The product sells itself!" Furthermore, "[w]hen it's time to service your accounts, you'll simply visit each store once every 2 weeks to replace the earrings that were sold . . . . We have found most distributors can easily service 3 accounts per hour, including driving time." (emphasis in original) (Facts ¶ 22 (b), (k)).
- Regarding locating services – "And the **best** part is you don't have to find the retail stores yourself–you can actually hire a professional locating company that specializes in retail product placement–we give you a list of several to choose from." (emphasis in original). (Facts ¶ 22 (l)).
- The locating services identified in the promotional material are experienced – The locating companies "have thousands of stores all over the country they've already done

business with for all *types* of products. When it comes to placing your earring displays–it's really just a matter of them contacting their existing accounts and telling them they'd like to introduce a new product." (emphasis in original). (Facts ¶ 22 (m)).

- The locating services identified in the promotional material are efficient – "When you're ready to get started, you'll get a list of stores who are waiting for your earrings and displays, it's really just a matter of picking out the ones you like best. If you are the distributor chosen for that territory, we get you set up and started making money immediately." (Facts ¶ 22 (n)).
- Regarding Evans Consulting, one of the locating services identified in the promotional material – "One of the locating companies that we've had real success with is Evans Consulting. "Evans Consulting." Their # is 800-589-0889. The owner of the company handles our account there. His name is Dave Evans. I know we've been on the phone a long time but when we hang up, I want you to take **2 minutes** and give Dave a call. Tell him that you were talking to ______ at *Designer [Collection]* and that you're going to be working in (<u>Prospects territory</u>), and you want to ask him, how many accounts he has in your area; how his guarantee works; in fact, any questions you have about the locations you want to address to Dave Evans, and assuming he can answer your questions to your satisfaction, Dave will get an information package out to you too. And we'll go ahead and send out the sample and information to you . . . ." (emphasis in original). (Facts ¶ 22 (o)).

- Regarding the availability of references – "[I]f you like, you can even speak with a bunch of people who are already in the business. You see (first name) we expect you to check this out thoroughly. Because our track record is impeccable [sic]. Once you check us out, and you see everything is exactly as I'm telling you, is there anything at all you see that could prevent you from getting started immediately" (wfa) Good!" (Facts ¶ 22 (p)).

After a prospective distributor spoke with an Elite Designs or The Designer Collection sales representative, Elite Designs and The Designer Collection typically sent the prospective customer promotional materials. (Facts ¶ 15). Many individuals who invested in Elite Designs and The Designer Collection received promotional material containing, *inter alia*, a welcome letter, a basic disclosure document, documents titled "How Can We Lead you Down the Road to Success," "Locating Accounts . . . What Should I Do?" and "Your Path to Profit," a Confidential Distributor Application, a Distributor Agreement, and papers explaining the three investment options: a 30 Display Package for $9,950 (includes 30 display racks, 2,100 pairs of earrings), a 45 Display Package for $14,300 (includes 45 display racks, approximately 3,150 pairs of earrings), or a 60 Display Package for $18,900 (includes 60 display racks, 4,200 pairs of earrings).[6] (Id.).

According to Elite Designs' and The Designer Collection's promotional materials, the business venture required only a "minimal investment of time and money [and purchasers] will

---

[6] In some promotional brochures the cost of employing a locating service was included in the price of the jewelry display rack packages. In these brochures, the 30 Display Package cost $12,950, the 45 Display Package cost $18,800, and the 60 Display Package cost $24,900. (Facts ¶ 15 (b)).

quickly reach a level of financial return that would prove impossible in nearly any comparable business venture." (Facts ¶ 15 (a)). The promotional material assured potential investors that "[w]hile you operate your business under your own business name, The Designer Collection will provide you with sparkling products, complete and easy training, a Distributor start-up kit, and an extensive representative support program. This tried and tested program includes locations, a toll-free customer service line, bonus merchandise, free shipping, an exchange policy and more." (Facts ¶ 15 (c)). To assist with locations, the promotional material contained the names and phone numbers of professional locating services that were "familiar with [Elite Designs' and The Designer Collection's] product" and have "worked successfully with many of [Elite Designs' and The Designer Collection's] distributors" (Facts ¶ 15 (f)).

Many Elite Designs and The Designer Collection promotional brochures also included a table entitled "Annual Profit Calculations" where yearly profit was determined based on the number of sales per week and number of locations. The various number of sales per week detailed in the table range from 4 jewelry sales per week per 30 display racks up to 12 jewelry sales per week per 100 display racks. The table shows the corresponding annual profit potential ranging from $26,520 (30 display racks averaging 4 sales a week) to $265,200 (100 display racks averaging 12 sales a week). (Facts ¶ 15 (g)).

Even though defendants' advertisements, sales script, and promotional material contained earnings representations within the meaning of the Franchise Rule, 16 C.F.R. § 436.1(b), defendants had no reasonable basis for these claims:

- The defendants were not aware of any jewelry distributor that earned $100,000 or more a year from an Elite Designs or The Designer Collection jewelry display rack distributorship. (Facts ¶ 24 (a)).
- The defendants did not know of any jewelry distributor that earned $75,000 a year from an Elite Designs or The Designer Collection jewelry display rack distributorship. (Facts ¶ 24 (b).
- The defendants did not know if any jewelry distributor earned over $1600 a week from an Elite Designs or The Designer Collection jewelry display rack distributorship. (Facts ¶ 24 (d)).
- The defendants did not actively track how much money the average Elite Designs and The Designer Collection jewelry distributor earned. (Facts ¶ 24 (e)).
- Antonelli testified that the statement by a sales representative that the average jewelry distributor can conservatively sell 2 pairs of earring per day per location was "[b]ased on the fact that if there's 48 pairs of earrings on a display sitting in a tanning salon that has 75 women walking in daily, odds are you're probably going to sell at least two pairs of earrings." (Facts ¶ 24 (f)).

As part of the sales process, Elite Designs' and The Designer Collection's sales representative commonly provided potential investors with the names and phone numbers of current jewelry distributors who could be contacted to gain what was described as "a ground level view of what the business is like as opposed to getting all of your information from the company." (Facts ¶ 29 (b), (c), (d)). Sales representatives who spoke to the undercover FTC

investigators warned the latter that should they purchase a jewelry distributorship they will be asked to take calls from prospective investors. "The only thing is they [the distributor references] normally can't handle it for more than about a week to 10 days because, you know, we're advertising in the papers. They get a lot of calls. . . . In fact, we--we kind of jokingly refer to them as the distributor of the week because that's about how long they last." (Facts ¶ 29 (a)).

Elite Designs and The Designer Collection provided the undercover FTC investigators with the names and phone numbers of the following jewelry distributors whom agreed to speak to potential jewelry investors: Diane Thompson of Connecticut, Desiree Nieves of New York, Joseph Marano of Maine, Patty Oliver of Alabama, and Michael Allen of New York. (Facts ¶ 29 (c), (d)). An undercover FTC investigator called the phone number provided for Diane Thompson. (Facts ¶ 30). Thompson told the undercover that she "absolutely love[d]" the business and that she recouped her initial investment in under seven months and earned close to $60,000 to $75,000 a year from the jewelry distributorship. (Facts ¶ 30 (a), (c), (f)). An undercover FTC investigator also called the phone number provided for Desiree Nieves. (Facts ¶ 33). Nieves stated that she had been operating her jewelry distributorship for approximately six months and the business was doing well. Nieves asserted that she used Route Builders, a locating service identified in Elite Designs' promotional material, to locate her accounts and she had already recouped her initial investment. (Facts ¶ 33 (a), (c), (d)).

Neither Diane Thompson nor Desiree Nieves was in fact an Elite Designs or The Designer Collection jewelry distributor. (Facts ¶¶ 31, 34). Thompson was a sales representative for Elite Designs. (Facts ¶ 31). Nieves is the daughter of Madeline Wagner, an Elite Designs

sales representative. (Facts ¶ 34). Both were paid by Elite Designs for the work that they performed posing as successful jewelry distributors. (Facts ¶¶ 31, 34). According to Declarations the government received from Elite Designs and The Designer Collection jewelry distributors ("Consumer Declarations"), Thompson's name and phone number was provided as a distributor reference to several distributors who subsequently invested in a jewelry display rack distributorship. (Facts ¶ 32).

A sales representative from Elite Designs and The Designer Collection also provided an undercover FTC investigator with the name and phone number of Joseph Marano, a jewelry distributor from Maine. (Facts ¶ 29 (c)). In truth, "Joseph Marano" was an alias employed by Joe Macchiarulo, a long-time sales representative for Elite Designs and The Designer Collection. Macchiarulo did not invest in a jewelry distributorship, he did not own jewelry display racks, he did not earn money from a jewelry distributorship, and he lived in Massachusetts not Maine. (Facts ¶ 35). Macchiarulo received two checks from Elite Designs and The Designer Collection, one for his work in sales and the other for posing as a distributor and speaking with potential jewelry investors. Although Macchiarulo employed the alias "Joseph Marano" when posing as a distributor, all of the checks that he received for his reference work were addressed to his real name and signed by Antonelli. (Id.).[7] Elite Designs and The Designer Collection's business

[7] Macchiarulo also testified that his brother, Anthony Macchiarulo, Jr., posed as a successful jewelry distributor and spoke to potential investors. The latter employed the alias of Anthony Renzi, which is identified as "Antoni Ramci" in a Consumer Declaration. (Facts ¶ 37). On February 21, 2005, a check signed by Defendant Antonelli was sent from The Designer Collection to Anthony Macchiarulo. The front of the check reflects that the payment is for (continued...)

records also reflect that Patty Oliver and Michael Allen, the two other individuals whose names and phone numbers were provided as references to an undercover FTC investigator, were not Elite Designs or The Designer Collection jewelry distributors. (Facts ¶ 36).

Consumer Declarations reflect that Elite Designs and The Designer Collection provided potential customers with the names and phone numbers of several other so-called distributors whom could be contacted to obtain a real-life view of the investment. The distributor references identified by consumers are: Madeline Wagner, Jonathan Timblin, John Baker, Debbie Miller, Janine Williams, Antoni Ramci, Mike Roberts, Cleo Christofferson, and Marie Butler. (Facts ¶ 37). The evidence demonstrates that none of these individuals were Elite Designs or The Designer Collection jewelry distributors. For instance, Madeline Wagner was not an Elite Designs or The Designer Collection jewelry distributor. She did not purchase jewelry display racks, she was not provided with jewelry display racks, she never had locations, and she never made money from an Elite Designs or The Designer Collection jewelry display rack distributorship. (Facts § 37 (a)). In fact, as noted, Wagner was a sales representative for Elite Designs. Like Macchiarulo, Wagner received two types of checks from Elite Designs, one for her sales work and one for the work she performed posing as a successful distributor. Both types of checks were signed by Antonelli. (Id.). Likewise, Jonathan Timblin was not an Elite Designs or The Designer Collection distributor. He did not own any jewelry display racks, he did not

---

[7](...continued)
"References/Deals." (Facts ¶ 37 (d)).

have any locations, and he did not make any money from an Elite Designs or The Designer Collection distributorship. (Facts ¶ 37 (b)). In truth, he was paid by The Designer Collection to pose as a successful distributor and speak to potential customers. On May 3, 2005, after the filing of this lawsuit, The Designer Collection wrote Timblin a check for $200.00 for "References." The check was signed by Antonelli. Timblin also employed the alias "John Baker" when posing as a successful jewelry distributor. (Id.).

**V. Argument**

**A. The Franchise Rule**

In December 1978, the Franchise Rule was adopted and the FTC published interpretive guidance for the Franchise Rule. On December 21, 1978, the FTC published the *Statement of Basis and Purpose of the Franchise Rule* – a discussion of the historical, legal and evidentiary basis for the Franchise Rule. 43 Fed. Reg. 59621 (December 21, 1978). Additionally, on August 24, 1979, the FTC published *The Final Guides to the Franchising and Business Opportunity Ventures Trade Regulation Rule*, 44 Fed. Reg. 49966. The *Final Guides* describe and interpret the provisions of the Franchise Rule. The *Statement of Basis and Purpose*, and the *Final Guides*, were prepared to assist franchisors in understanding, and complying with, the Franchise Rule. Id. at 49966. Moreover, the FTC publishes Staff Advisory Opinions regarding the Franchise Rule which also assist franchisors in understanding, and complying with, the Franchise Rule.

The Franchise Rule has two coverage definitions whereby it applies to both (1) "product" or "service" franchises and (2) vending and display rack "business opportunity" ventures. A business that meets either of the definitions of the Franchise Rule is a franchise regardless of the

seller's intent or the characterization the seller places on the business opportunity. See *Final Guides*, 44 Fed. Reg. 49966 (Aug. 24, 1979); FTC v. Int'l Computer Concepts, Inc., 1994-2 Trade Cases (CCH) ¶ 70,798, 1994 WL 730144, *13 (N.D. Ohio 1994). Any business relationship represented either orally or in writing as containing all of the elements of either a business opportunity venture or a product franchise is a franchise subject to the Franchise Rule's requirements, even if the representations are not fulfilled." FTC v. Int'l Computer Concepts, Inc., at *13. It is FTC policy to broadly interpret the business opportunity section of the Franchise Rule to cover most business opportunity ventures, the most common of which are distributorships, rack jobbing, and vending machine routes. *Final Guides*, 44 Fed. Reg. at 49969.

Substantial deference must be given to an agency's interpretation of its regulations. Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994); see also Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 566 (1980) ("An agency's construction of its own regulations has been regarded as especially due [] respect."). It is not the Court's task "to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Thomas Jefferson Univ., 512 U.S. at 512 (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945)). Agency interpretations, whether issued by the FTC staff or by the Commission, are entitled to deference because of the agency's expertise in the regulated area. Ford Motor Credit Co. v. Milhollin, 444 U.S. at 566 n.9.

**B. <u>Elite Designs' and The Designer Collection's Jewelry Display Rack Distributorships are Business Opportunity Franchises</u>**

A business opportunity franchise exists if the following three conditions are met:

(1) the franchisee sells goods or services supplied by the franchisor or a supplier chosen by the franchisor, 16 C.F.R. § 436.2(a)(1)(ii)(A);

(2) the franchisor secures locations for the vending machines or display racks, or provides the franchisee with the services of a person able to secure sites for the vending machines or display racks, 16 C.F.R. § 436.2(a)(1)(ii)(B); and

(3) the franchisee is required to pay the franchisor a sum of at least $500, 16 C.F.R. § 436.2(a)(2) and (a)(3)(iii).

Elite Designs' and The Designer Collection's jewelry display rack opportunities satisfy all three requirements of a business opportunity franchise. This Court should therefore rule that the distributorships sold by Elite Designs and The Designer Collection are, as a matter of law, "franchises" as that term is defined under the Franchise Rule.

**(1) <u>Product Suppliers</u>**

The first requirement is met because Elite Designs and The Designer Collection supplied their investors with jewelry that the latter then sold for a mark-up in retail outlets. (Facts ¶¶ 10, 12, 15 (b), (c), (g), (i), (j); 22 (c), (d)). As one sales representative explained to an undercover FTC investigator, "We set you up in business and then you buy from us for years to come. That's how it works." (Facts ¶ 20 (h). In addition to providing investors with jewelry supplies, Elite Designs and The Designer Collection also furnished distributors with the necessary

paperwork, order forms, and accounting forms. (Facts ¶¶ 15 (a), (d); 20(e); 22(j)).

(2) Location Assistance

The second requirement is met because Elite Designs and The Designer Collection secured locations for the jewelry displays, or provided the franchisee with the services of a person able to secure such sites. 16 C.F.R. § 436.2(a)(1)(ii)(B). To satisfy the second requirement, it is not necessary to show that the franchisor assumed all the responsibility for securing the locations for the franchisees. Referring purchasers to independent companies that provide location services, or providing them with a list of such companies, meets the location requirement. See FTC v. Showcase Distrib., Inc., Bus. Franchise Guide (CCH) [1995-96 Transfer Binder] ¶ 10,770 at 27,289, 27,293 (D. Ariz. 1995); FTC v. Jordan Ashley, Inc., 1994-1 Trade Cas. (CCH) at 72,096, 72,098; Garcia Mktg., Bus. Franchise Guide (CCH) ¶ 6415 at 9582-83 (May 29, 1980).

The FTC determined that the "location assistance" requirement is an elastic concept that will likely apply if the seller introduces the investor to a third person to secure locations, accounts or sites, or merely provides the investor with a list of such persons, or instructs investors on how to find locations. See FTC v. Showcase Distrib., Inc., at 27,289, 27,293; see also Garcia Mktg., at 9582 ("To conclude that the second definitional prerequisite is met only where a business opportunity seller literally 'secures' locations, accounts or vending machine sites, or 'provides' the services of a locator . . . , would be to adopt a narrow reading of the requirement, contrary to the Commission's express intention of employing a flexible standard for determining the level or degree of assistance necessary to meet this prerequisite"); Opinion 93-8,

Bus. Franchise Guide (CCH) ¶ 6452 at 9629, 9630 (July 22, 1993) ("To the extent that a business opportunity investor relies on the expertise of the seller to establish a distribution network, we see no material difference whether that seller directly supplies investors with a locator, or refers investors to locators.").

As is stated in the Franchise Rule's *Statement of Basis and Purpose*, 43 Fed. Reg. 59706 (Dec. 21, 1978), the focus of the inquiry is the type and degree of assistance offered or promised by the seller to the purchaser of the business opportunity. The element is satisfied when the seller offers or promises to provide significant assistance in obtaining locations.

> The second definitional prerequisite requires . . . no more than that a business opportunity seller offer "significant assistance" to investors in obtaining locations, accounts, vending machine sites or the services of a locator. Thus, the fact that a business opportunity seller may not offer to do everything necessary to "secure" locations or actually "provide" a locator will not necessarily insulate it from franchise rule coverage. Consequently, both direct and indirect means of providing significant location assistance may satisfy the second definitional prerequisite.

Garcia Mktg. at 9583. The issue is "whether the degree of assistance offered by a business opportunity seller, viewed as part of the total business opportunity offered, promises to 'substantially reduce the franchisee's risk of doing business' and 'in essence . . . [to] put the franchise into a pre-packaged business.'" Id. at 9583 citing 43 Fed. Reg. at 59707; Opinion 93-8, at 9630 (To meet the definition, the seller "need not literally secure locations for an investor.").

Moreover, Franchise Rule coverage attaches even if the seller of the business venture does not actually provide the assistance it promised. 16 C.F.R. § 436.2(a)(5); see also Garcia Mktg. at 9583 (noting that only an offer or promise to provide significant assistance is

necessary; the actual fulfillment of the promise is not required); the *Final Guides*, 44 Fed. Reg. at 49966 ("[T]he rule covers relationships which are represented either orally or in writing as having characteristics specified in the rule's definition of 'franchise' regardless of whether the representations are, in fact, fulfilled."). This is because it is the promise of the "pre-packaged" business that convinces people to invest, regardless of whether those promises are fulfilled. If anything, the Franchise Rule's protections are most needed by those who hear empty promises.

Elite Designs and The Designer Collection provided prospective purchasers with the services of persons able to secure locations for their jewelry display racks. It was standard practice for Elite Designs and The Designer Collection to identify the names and phone numbers of professional locating services in their promotional material.[8] (Facts ¶¶ 15 (c), (f); 17; 20 (j); (o); 22 (l)). Defendants vouched that the locating services identified in the promotional material were "familiar with our product" and had "worked successfully with many of our distributors." (Facts ¶ 15 (f)). The promotional material also emphasized the turn-key nature of the business venture, explaining that distributors would be provided with a "tried and tested program includ[ing] locations." (Facts ¶ 15 (c)). Moreover, the promotional material touted that "a selection of pre-set, high quality retail locations will take all the worry out of starting a new business venture." (Facts ¶ 15 (f)).

Elite Designs' and The Designer Collection's sales representatives also assured potential investors that they need not worry about locations. Sales representatives highlighted the fact that

---

[8] In some promotional material the cost of employing a locating service was already included in the investment price. (Facts ¶ 15(b)).

investors "can actually hire a professional marketing company that specializes in retail product placement. We give you a list of about 10 to choose from." (Facts ¶ 20 (j)). Sales representatives represented that by the time an investor is "ready to get started, [the investor will] get a list of stores [from the locating service that] are waiting for the earrings. It's really just a matter of picking out the ones [the investor] like best." The use of a locating service is "really the most expeditious way to get up and running." (Facts ¶ 20 (k), (l)).

A sales script employed by Elite Designs and The Designer Collection emphasized that investors need not obtain their own account sites. The sales script stated, "And the **best** part is you don't have to find the retail stores yourself–you can actually hire a professional locating company that specializes in retail product placement–we give you a list of several to choose from." (emphasis in original). (Facts ¶ 22 (l)). Antonelli testified that the word "best" was highlighted in the sales script "[b]ecause most people are not willing to go out and get the retail locations on their own. They much rather would pay a locating service to do that for them." Id. That same sales script urged consumers to take a few minutes and call Dave Evans of "Evans Consulting," one of the locating services identified in defendants' promotional material. (Facts ¶ 22 (o)). Potential investors were instructed to call Evans Consulting because, unbeknownst to the consumers, defendants were attempting to gauge how interested the consumers were in purchasing the business opportunity. (Facts ¶ 28). When a consumer took the time to call Evans Consulting, Dave Evans relayed this information back to Elite Designs and The Designer

Collection.[9] (Id.).

Elite Designs and The Designer Collection also promised to provide significant location assistance to investors who chose to forego the use of a professional locating service. Sales representatives emphasized, "we're going to hold your hand and show you how to get your accounts on your own." (Facts ¶ 20 (s)). As part of the hand-holding, Elite Designs and The Designer Collection provided investors with a complete training package that included a presentation that was "so good, no stores will refuse to sell your earrings." (Facts ¶ 20 (q), (r)).

Since Elite Designs and The Designer Collection provided prospective purchasers with the names and phone numbers of persons able to secure locations for their jewelry display racks in their promotional materials and promised significant assistance to investors who chose to forego the use of a locating company, Elite Designs and The Designer Collection provided the requisite location assistance to fall within the Franchise Rule.

(3) **Payment of $500**

Elite Designs and The Designer Collection also satisfy the third condition, requiring "as a condition of obtaining or commencing the franchise operation," a "payment or commitment to pay the franchisor" $500 or more within six months after commencing operation of the franchisee's business. 16 C.F.R. § 436.2(a)(2) and (a)(3)(iii). Payments required in order for a

---

[9] The relationship between defendants and the locating services was significant. Antonelli personally met with the owners of at least three locating services advertised in Elite Designs' and The Designer Collection's promotional material. He also negotiated the locating fee that at least one such locating service, Evans Consulting, could charge jewelry investors per location. (Facts ¶ 7 (n)).

franchisee to acquire its initial equipment and supplies, without which the franchisee cannot commence operation of the venture, satisfy this requirement. FTC v. Jordan Ashley, Inc., 1994-1 Trade Cas. (CCH) at 72,098; Langlois, Bus. Franchise Guide (CCH) ¶ 6402 (Jan. 24, 1980). In this instant case, the least expensive investment package offered by Elite Designs and The Designer Collection cost $9,950. (Facts ¶ 15 (b)).

In sum, the business opportunities the defendants sold meet the definition of a business opportunity franchise.

C. **Defendants Violated the Franchise Rule**

(1) **Elite Designs and The Designer Collection Violated the Franchise Rule by Failing to Provide Prospective Franchisees with a Complete and Accurate Disclosure Statement**

The Franchise Rule requires a franchisor to provide prospective franchisees with a complete and accurate basic disclosure statement containing twenty categories of information, including information about the history of the franchisor, the terms and conditions under which the franchise operates, and important identifying information about other franchisees. 16 C.F.R. § 436.1(a)(1) - (20). Disclosure of this information enables a prospective franchisee to assess potential risks involved in the purchase of the franchise. In connection with the offer of franchises, Elite Designs and The Designer Collection provided prospective franchisees with a basic disclosure document. (Facts ¶ 19). The basic disclosure documents, however, were incomplete and inaccurate:

(1) None of the disclosure documents contain the names, addresses, and telephone numbers of any of the existing jewelry distributors. (Facts ¶ 19 (a)). Without these names and

telephone numbers, prospective franchisees had no way of contacting existing distributors and could not substantiate any of the promises and earnings claims defendants made. Instead of disclosing the names and telephone numbers of existing franchisees, defendants provided potential investors with the names and telephone numbers of individuals who defendants paid to pose as successful distributors. (Facts ¶¶ 29 - 37).

(2) All of the disclosure documents profess that Antonelli is a graduate of the University of Rhode Island. Antonelli never graduated from the University of Rhode Island. (Facts ¶ 19 (b)).

(3) The January 2003 and January 2004 disclosure documents maintain that Elite Designs had 232 distributors operating in 37 states. Neither Elite Designs nor The Designer Collection ever possessed 232 jewelry distributors. (Facts ¶ 19 (c)).

(4) The September 1, 2004, and January 10, 2005, disclosure documents fail to disclose that Antonelli was subject to an Order to Cease and Desist ("Order") issued by the State of South Dakota in August 2004. The Order was issued, in part, due to misleading and untrue statements made in connection with the sale of Antonelli's candle display rack business opportunities. (Facts ¶ 19 (d)). Antonelli was aware of the Order because he wrote a letter responding to the Order. (Facts ¶ 40).

Accordingly, Elite Designs and The Designer Collection have, as a matter of law, violated § 436.1(a) of the Franchise Rule, 16 C.F.R. § 436.1(a), and § 5 of the FTC Act, 15 U.S.C. § 45.

(2) **<u>Elite Designs and The Designer Collection Violated the Franchise Rule by Making Earnings Claims While Lacking a Reasonable Basis, Failing to Disclose that Material Which Constitutes a Reasonable Basis for the Claim is Available, and Failing to Provide Prospective Franchisees with a Document Containing Information Substantiating Earnings Claims</u>**

The Franchise Rule requires: (1) that the franchisor have a reasonable basis for any oral, written, or visual earnings or profit representations ("earnings claims") made by a franchisor or its employees or agents to a prospective franchisee, 16 C.F.R. § 436.1(b)(2), (c)(2); (2) that the franchisor, in immediate conjunction with such claims, disclose that materials which constitute a reasonable basis for such claims are available to the prospective franchisee, <u>Id.</u>; and (3) that the franchisor provide to prospective franchisees a document containing information substantiating the earnings claim (the "earnings claim document"), 16 C.F.R. § 436.1(b)(3) - (c)(3).

Representations that state specific levels of potential sales and income are earnings claims within the meaning of the Franchise Rule. <u>See</u> 16 C.F.R. § 436.1(b). From the very beginning of the sales process through the time of investment, Elite Designs and The Designer Collection made numerous earnings claims within the meaning of the Franchise Rule, 16 C.F.R. § 436.1(b)-(e). Virtually all of these earnings claims lacked a reasonable basis. Elite Designs and The Designer Collection drummed up interest in its classified advertisements by declaring "Make $100K/yr." and "EARN $100K!" (Facts ¶¶ 10, 12). Defendants, however, did not know of any jewelry distributor that earned $100,000 a year or more from an Elite Designs or The Designer Collection distributorship. Nor were they aware of any distributor that earned $75,000 a year from their jewelry distributorships. (Facts ¶ 24 (a), (b)). As part of their sales presentation, sales representatives for Elite Designs or The Designer Collection told undercover

FTC investigators that based on reorders they knew "that the average store is selling at least two pairs of earrings per day." (Facts ¶ 21 (b)). Defendants admit that this assertion was "[b]ased on the fact that if there's 48 pairs or earrings on a display sitting in a tanning salon that has 75 women walking in daily, odds are you're probably going to sell at least two pairs of earrings. (Facts ¶ 24 (f)).

A sales script employed by sales representatives for Elite Designs and The Designer Collection stated that some distributors earn $1,000 a week or more in net profit. (Facts ¶ 22 (a)). Neither Elite Designs nor The Designer Collection, however, actively tracked distributors' earnings. (Facts ¶ 24 (e)). That same sales script insisted that "in a really good location, you can easily sell 3 to 4 pairs of earrings a day." (Facts ¶ 22 (d)). Defendants concede that this assertion was based on nothing more than "speculation." (Facts ¶ 24 (g). Promotional material that Elite Designs and The Designer Collection sent to potential investors also contained unfounded earnings claims, displaying a table that projected profits up to $265,200 per year. (Facts ¶ 15 (g)).

In addition to making earnings claims that lacked a reasonable basis, Elite Designs and The Designer Collection failed to disclose that material substantiating the earnings claims was available and failed to provide prospective franchisees with the earnings claim document required by the Franchise Rule. (Facts ¶¶ 25, 26). Elite Designs and The Designer Collection have thereby, as a matter of law, violated § 436.1(b) - (c) of the Rule, 16 C.F.R. § 436.1(b) - (c), and § 5 of the FTC Act, 15 U.S.C. § 45.

(3) **<u>Elite Designs and The Designer Collection Violated the Franchise Rule by Failing to Include Required Disclosures in Generally Disseminated Earnings Claims</u>**

Where sellers of franchises use classified advertisements that include representations about levels of profits or sales, either actual or potential, the Franchise Rule requires the seller to include in the advertisement a statement of the number and percentage of prior purchasers who the seller knows have earned as much or more than the claim. 16 C.F.R. § 436.1(e)(3). This information is required so that potential purchasers can assess the typicality of the claim.

Elite Designs' newspaper advertisements represented that for an investment of $12,950, purchasers could earn $100,000 per year. (Facts ¶ 10). Nowhere in the advertisement is there a statement of the number and percentage of prior purchasers who have earned as much or more than $100,000 per year as required by the Franchise Rule. (<u>Id.</u>). Similarly, The Designer Collection's advertisements represented that for an investment of $9,950, purchasers could earn $100,000. (Facts ¶ 12). Nowhere in the advertisement is there a statement of the number and percentage of prior purchasers who have earned as much or more than $100,000 as required by the Franchise Rule. (<u>Id.</u>). In fact, none of the advertisements for Elite Designs and The Designer Collection that contain earnings claims included a statement in the advertisement of the number and percentage of prior purchasers who had earned as much or more than the earnings claim made. (Facts ¶¶ 11, 13). Therefore, as a matter of law, Elite Designs and The Designer Collection have violated § 436.1(e) of the Rule, 16 C.F.R. § 436.1(e), and § 5 of the FTC Act, 15 U.S.C. § 45.

D. **Defendant Antonelli, Elite Designs' and The Designer Collection's Sole Officer and Shareholder is Personally Liable for Violations of the Franchise Rule**

Under the FTC Act, once corporate liability is established, an individual defendant is liable if (1) the individual participated directly in the wrongful practices or acts, or the individual had authority to control them, and (2) the individual had some knowledge of the practices. FTC v. Amy Travel Service, Inc., 875 F.2d 564, 573 (7th Cir.). "Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming duties of a corporate officer." Id. The individual need not have had a subjective intent to violate the Franchise Rule, or even to have been aware of the wrongful activity. United States v. Building Inspector of America, Inc., 894 F. Supp. 507, 518 (D. Mass. 1995); FTC v. Kitco of Nevada, Inc., 612 F. Supp. 1282, 1292 (D. Minn. 1985). Actual knowledge, reckless indifference, or an awareness of a high probability of wrongdoing is enough. FTC v. Amy Travel Service, 875 F.2d at 574; FTC v. National Business Consultants, 781 F. Supp 1136, 1153 (E.D. La. 1991); Kitco, 612 F. Supp. at 1292; Building Inspector, 894 F. Supp. at 518.

At all times material to this action, Antonelli served as the President, Vice-President, Treasurer, Secretary and sole shareholder of Elite Designs and The Designer Collection. (Facts ¶ 5). Antonelli formulated, directed, controlled, or participated in the sale and promotion of Elite Designs' and The Designer Collection's jewelry display rack business opportunities, for instance, Antonelli hired, fired, and paid Elite Designs and The Designer Collection telemarketers; Antonelli possessed ultimate authority over who became a jewelry distributor; Antonelli met

with potential jewelry distributors, spoke to existing jewelry distributors, and responded to existing jewelry distributors' complaints and requests for refunds; Antonelli determined if, and under what circumstances, a jewelry distributor was entitled to a discount or could amend the terms of the standard Distributor Agreement; Antonelli met the owners of at least three locating services advertised in defendants' promotional material. (Facts ¶ 7). Antonelli also executed every Distributor Agreement entered between Elite Designs and The Designer Agreement and a consumer. (Facts ¶ 7(b)).

Antonelli concedes that as President of Elite Designs and The Designer Collection he maintained final authority over what occurred at the companies. (Facts ¶ 7 (t), (u)). The only issue thus is whether Antonelli possessed some knowledge or an awareness of a high probability that Elite Designs and The Designer Collection were violating the Franchise Rule. Uncontroverted evidence demonstrates that Antonelli possessed the requisite knowledge to be held personally liable for the Franchise Rule violations committed by Elite Designs and The Designer Collection.

(1) **Defendant Antonelli Is Personally Liable For Elite Designs' and The Designer Collection's Failure to Provide Prospective Franchisees With a Complete and Accurate Disclosure Statement**

Antonelli reviewed and approved the corporate defendants' basic disclosure document dated January 2004. The basic disclosure document is inaccurate and incomplete because it does not contain the names, addresses, and telephone numbers of any of the existing jewelry distributors; the document falsely states that Antonelli graduated from the University of Rhode Island; and the document incorrectly maintains that Elite Designs has 232 distributors operating

in 37 states. (Facts ¶ 38).

Antonelli compiled the information contained in the corporate defendants' basic disclosure document dated January 2005. (Facts ¶ 39). The basic disclosure document is inaccurate and incomplete because it does not contain the names, addresses, and telephone numbers of any of the existing jewelry distributors; the document falsely states that Defendant Antonelli graduated from the University of Rhode Island; and the document fails to disclose that Antonelli is subject to an Order issued by the State of South Dakota in August 2004. The Order was issued, in part, due to misleading and untrue statements made in connection with the sale of Antonelli's candle display rack business opportunities. (Facts ¶ 39). Antonelli was aware of the Order because he sent a response to the State of South Dakota via letter. (Facts ¶ 40).

Given the aforementioned evidence, Antonelli is personally liable for Elite Designs' and The Designer Collection's failure to provide prospective franchisees with an accurate and complete basic disclosure document as required by The Franchise Rule, 16 C.F.R. § 436.1.

(2) **Defendant Antonelli Is Personally Liable for Elite Designs' and The Designer Collection's Earnings Claims Lacking a Reasonable Basis, Elite Designs and The Designer Collection's Failure to Disclose that Material Which Constitutes a Reasonable Basis for the Claim Is Available, and Elite Designs' and The Designer Collection's Failure to Provide Prospective Franchisees with a Document Containing Information Substantiating Earnings Claims**

Antonelli approved a sales script employed by Elite Designs and The Designer Collection sales representatives that proclaimed that distributors who sell only two pairs of earrings a day per location, a "conservative" estimate, earn "$1,602 a week. Over $1400 a week? How's that sound to you _______ (WFA) and $1500 a week is over $75,000 a year! And all you

have to do is service your accounts once day a week." (Facts ¶ 22). Antonelli approved newspaper advertisements that exclaimed "100K+ yr potential" and reviewed promotional material that contained a table where yearly profit was determined based on the number of sales per week and number of locations. The table showed the corresponding annual profit potential ranging from $26,520 (30 display racks averaging 4 sales a week) to $265,200 (100 display racks averaging 12 sales a week). (Facts ¶¶ 41, 42).

Antonelli lacked a reasonable basis for the earnings claims that he approved in Elite Designs' and The Designer Collection's sales script, advertisements, and promotional material. Antonelli did not know of any jewelry distributor that earned $100,000 or more from investing in an Elite Designs or The Designer Collection distributorship. (Facts ¶ 24 (a)). Antonelli did not know of any jewelry distributor that earned $75,000 a year from investing in one of his jewelry display rack distributorships. (Facts ¶ 24 (b)). Antonelli did not know if jewelry distributors earned over $1,600 a week and he did not know or track how much money the average Elite Designs and The Designer Collection jewelry distributor earns per week. (Facts ¶ 24 (d), (e)). Antonelli concedes that the claim in the sales script approved by him that "in a really good location, you can easily sell 3 to 4 pairs of earrings a day," was based on nothing more than "speculation." (Facts ¶ 24 (g)). The lack of any good faith basis for these speculative earnings claims is underscored by the fact that Antonelli signed checks for the same phony references for whom he also signed sales commission checks. (Facts ¶¶ 31, 35, 37 (a)). If the promised earnings were real, it would not have been necessary for Antonelli to pay his salespersons to act as shills.

Antonelli also admitted that his companies did not tell potential investors that material substantiating the earnings claims made in sales pitches, newspaper advertisements, and promotional material was available for inspection. Nor did Elite Designs and The Designer Collection provide potential investors with the requisite "earnings claim document." (Facts ¶¶ 25, 26).

Accordingly, Antonelli is personally liable for the corporate defendants' failure to have a reasonable basis for earnings claims made, failure to disclose that material that constitutes a reasonable basis for the claims is available, and failure to provide the required "earnings claim document," all in violation of The Franchise Rule, 16 C.F.R. § 436.1 (b) - (c).

(3) **Defendant Antonell is Personally Liable for Elite Designs' and The Designer Collection's Failure to Include the Required Disclosures in Generally Disseminated Earnings Claims**

Antonelli reviewed, revised, and approved advertisements for Elite Designs and The Designer Collection that appeared in newspapers around the country. Antonelli approved newspaper advertisements proclaiming "100K+ yr potential." (Facts ¶ 41). Antonelli conceded that none of Elite Designs' and The Designer Collection's advertisements disclose in immediate conjunction with the claims the number and percentage of prior purchasers known to have achieved the same or better results (which number and percentage were both zero). (Facts ¶¶ 11, 13, 24). Antonelli thus is personally liable for Elite Designs' and The Designer Collection's failure to include the required disclosures in advertisements, a violation of the Franchise Rule, 16 C.F.R. 436.1 (e).

There can be no dispute that Antonelli maintained the requisite authority and knowledge

to be individually liable for Elite Designs' and The Designer Collection's violations of the Franchise Rule under the FTC Act.

## VI. Conclusion

For the foregoing reasons, this Court should grant the United States' Motion for Summary Judgment as to Liability, finding that Elite Designs and The Designer Collection are subject to the Franchise Rule, that defendants violated the Franchise Rule, and that Elite Designs, The Designer Collection, and Anthony Antonelli are liable for violations of the Franchise Rule.

Respectfully submitted,

UNITED STATES OF AMERICA

PETER D. KEISLER, JR.
Assistant Attorney General
Civil Division
U.S. Department of Justice

EUGENE M. THIROLF
Director
Office of Consumer Litigation

AMY E. GOLDFRANK, Trial Attorney
Office of Consumer Litigation
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20044
202 307-0050
Fax: 202 514-8742

ROBERT CLARK CORRENTE
United States Attorney

ROBIN E. FEDER
Assistant United States Attorney
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903
401 709-5000
Fax: 401 709-5017

OF COUNSEL:

LOIS GREISMAN
Associate Director for Marketing Practices
Federal Trade Commission

MICHAEL J. DAVIS
Attorney
Federal Trade Commission
600 Pennsylvania Ave., N.W., Rm. 238
Washington, DC 20580
202 326-2458
Fax: 202 326-3395

CERTIFICATE OF SERVICE

I hereby certify that the aforementioned "Memorandum in Support of United States' Motion for Summary Judgment as to Liability" was sent from the Office of Consumer Litigation, Department of Justice, Washington, D.C. via Federal Express on May 31, 2006, to:

Jeffrey K. Techentin
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, Rhode Island 02903

Attorney for Defendants Elite Designs, Inc., The Designer Collection, Inc. and Anthony Antonelli

Amy E. Goldfrank