UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>ELITE DESIGNS, INC., a Rhode Island corporation, and<br>THE DESIGNER COLLECTION, INC., a Rhode Island corporation, and<br>ANTHONY ANTONELLI, individually and as an officer of the corporations,<br>Defendants. | C.A. NO. 05-058-S |

**UNITED STATES' STATEMENT OF UNDISPUTED FACTS**

There is no genuine dispute as to the following facts material to Plaintiff United States' assertions that the defendants sold franchises as "franchise" is defined in § 436.2(a) of the Franchise Rule, 16 C.F.R. § 436.2(a), and that the defendants violated the Franchise Rule.

1. Defendant Elite Designs, Inc., ("Elite Designs") is a Rhode Island corporation with its principle place of business at 18 Thelma Avenue, North Providence, Rhode Island. (Amended Complaint ¶ 4, attached as Exhibit 1; Answer to Amended Complaint ¶ 4, attached as Exhibit 2).

2. Defendant The Designer Collection, Inc., ("The Designer Collection") is a Rhode Island corporation with its principle place of business at 18 Thelma Avenue, North Providence, Rhode Island. (Amended Complaint ¶ 5, attached as Exhibit 1; Answer to Amended Complaint

¶ 5, attached as Exhibit 2).

3. Elite Designs and The Designer Collection promoted and sold jewelry display rack business opportunities. (Defendants' Response to United States' First Request for Admissions ("Response to Request for Admissions"), Response Nos. 1, 2, 5, 6, 11, attached as Exhibit 3; Elite Designs Presents: The Designer Collection promotional packet ("Elite Designs Packet"), attached as Exhibit 4; and The Designer Collection promotional packet ("Designer Collection Packet"), attached as Exhibit 5).

4. Elite Designs and The Designer Collection transacted business in the District of Rhode Island. (Amended Complaint ¶¶ 4 and 5 attached as Exhibit 1; Answer to Amended Complaint ¶¶ 4 and 5, attached as Exhibit 2).

5. At all times material to this matter, Defendant Anthony Antonelli served as the President, Vice-President, Secretary, Treasurer, and sole shareholder of Elite Designs and The Designer Collection. (Defendants' Supplemental Answers to United States' First Set of Interrogatories, Interrogatory No. 21, attached as Exhibit 6; Antonelli July 2005 deposition at p. 33, lines 7 - 21; p. 180, line 21 - p. 181, line 13, attached as Exhibit 7).

6. Antonelli resides or transacted business in the District of Rhode Island. (Amended Complaint ¶ 6 attached as Exhibit 1; Answer to Amended Complaint ¶ 6, attached as Exhibit 2).

7. At all times material to this matter, acting alone or in concert with others, Antonelli formulated, directed, controlled, or participated in the sale and promotion of Elite Designs' and The Designer Collection's jewelry display rack business opportunities:

a. Antonelli sat on Elite Designs' and The Designer Collection's jewelry distributor Selection Committee and possessed ultimate authority over who became a jewelry distributor.[1] (Antonelli July 2005 deposition, at p. 121, line 22 - p. 122, line 17, attached as Exhibit 7).

b. Antonelli signed all of the Distributor Agreements on behalf of Elite Designs and The Designer Collection. (Response to Request for Admissions, Response Nos. 27 and 28, attached as Exhibit 3).

c. Antonelli paid Elite Designs' and The Designer Collection's telemarketers. (Antonelli July 2005 deposition at p. 54, line 25 - p. 55, line 19; p. 184, line 21 - p. 185, line 4, attached as Exhibit 7).

d. Antonelli hired and fired certain Elite Designs and The Designer Collection employees and agents, some of whom defendants refer to as "contractors." (Antonelli July 2005 deposition at p. 52, lines 6 -17; p. 70, line 23 - p. 71, line 7, attached as Exhibit 7).

e. Antonelli was one of two individuals authorized to access Elite Designs' bank account. (Antonelli July 2005 deposition at p. 78, line 18 - p. 79, line 2, attached as Exhibit 7).

f. Antonelli wrote all of the checks drawn from The Designer Collection's bank account and most, if not all, of the checks drawn from Elite Designs' bank

---

[1] The term "jewelry distributor" refers to consumers who invested in an Elite Designs or The Designer Collection jewelry display rack business opportunity.

account. (Antonelli September 2005 deposition at p. 20, lines 2 - 13, attached as Exhibit 8; Macchiarulo deposition at p. 97, lines 7 - 24, attached as Exhibit 9; See also, Thompson Check, attached as Exhibit 10; JS Locating Check, attached as Exhibit 11).

g. Antonelli paid the rent for a telemarketing room where several Elite Designs and/or The Designer Collection sales representatives sold jewelry display rack business opportunities. (Antonelli July 2005 deposition at p. 66, lines 15 - 19, attached as Exhibit 7).

h. Antonelli met with potential jewelry distributors, spoke to existing jewelry distributors, dealt with certain jewelry distributor complaints, and responded to jewelry distributors' requests for refunds. (Antonelli July 2005 deposition at p. 171, lines 1 - 16; p. 173, lines 6 - 21; p. 175, lines 1 - 11, attached as Exhibit 7; Baker Declaration at bates no. ED-663, attached as Exhibit 12; White Declaration at bates no. ED-1443, attached as Exhibit 13; Letter to Hutsinger, attached as Exhibit 14; Morgan letter, attached as Exhibit 15).

i. Antonelli determined if, and under what circumstances, a jewelry distributor was entitled to a discount or could amend the terms of the standard Distributor Agreement. (Antonelli September 2005 deposition at p. 53, line 13 - p. 54, line 2, attached as Exhibit 8; Drier Contract, attached as Exhibit 16; Castro Declaration at bates no. ED-997 to ED-1000, attached as Exhibit 17).

j. Antonelli reviewed and revised certain of Elite Designs' and The Designer Collection's advertisements. (Antonelli July 2005 deposition, attached as Exhibit 7, at p. 146, lines 18 - 23 (discussing an advertisement that is attached as Exhibit 18); p. 164, line 11 - p. 165, line 6; p. 209, line 20 - p. 211, line 6 (discussing an advertisement that is attached as Exhibit 19).

k. Antonelli approved and reviewed certain of Elite Designs' and The Designer Collection's sales scripts. (Antonelli July 2005 deposition, attached as Exhibit 7, at p. 204, line 1 - p. 205, line 18 (discussing a sales script that is attached as Exhibit 20).

l. Antonelli reviewed and contributed to Elite Designs' and The Designer Collection's promotional material. (Antonelli July 2005 deposition, attached as Exhibit 7, at p. 87, line 22 - p. 90, line 11 (discussing promotional material that is attached as Exhibit 4); Antonelli September 2005 deposition, attached as Exhibit 8, at p. 35, line 25 - p. 36, line 6 (discussing promotional material that is attached as Exhibit 5).

m. Antonelli approved and contributed to certain of Elite Designs' and The Designer Collection's basic franchise disclosure documents. (Antonelli July 2005 deposition, attached as Exhibit 7, at p. 127, line 5 - p. 128, line 6 (referencing a disclosure document attached as Exhibit 35); p. 185, lines 5 - 20 (referencing a disclosure document attached as Exhibit 21).

n. Antonelli met with the owners of at least three of the professional locating services advertised in Elite Designs' and/or The Designer Collection's promotional material, and negotiated the locating fee that at least one such service could charge Elite Designs and The Designer Collection investors. (Antonelli July 2005 deposition at p. 103, lines 20 - 25, attached as Exhibit 7; Evans declaration ¶¶ 3, 5, attached as Exhibit 22).

o. Elite Designs' and The Designer Collection's promotional material instructed potential jewelry distributors to fax their Confidential Distributor Applications to Antonelli. (Elite Designs Packet at bates no. ED-276 to ED-277, attached as Exhibit 4).

p. The training manual sent to jewelry distributors upon investment contains business tips from Antonelli. (Distributor Manual, attached as Exhibit 23).

q. At least one version of The Designer Collection's promotional material contains a "welcome letter" from Antonelli. (Designer Collection Packet at bates no. DES-ED-DOCS-781, attached as Exhibit 5).

r. Antonelli possessed the authority, if he so chose, to order an employee, agent, and/or "contractor" to work at company headquarters rather than from home. (Antonelli July 2005 deposition at p. 80, line 13 - p. 81, line 9, attached as Exhibit 7).

s. Antonelli represented Elite Designs at a meeting with the Better Business Bureau and subsequently ordered the removal of an Elite Designs website from the

Internet. (Antonelli July 2005 deposition at p. 165, line 10 - p. 166, line 8, attached as Exhibit 7).

t. By his own account, Antonelli oversaw Elite Designs' operations, supervised Elite Designs' finances, and possessed final authority over what occurred at Elite Designs. (Antonelli July 2005 deposition at p. 32, lines 4 - 19, attached as Exhibit 7).

u. By his own account, Antonelli maintained final authority over what occurred at The Designer Collection. (Antonelli September 2005 deposition at p. 45, lines 13 - 16, attached as Exhibit 8).

8. Elite Designs starting selling jewelry display rack business opportunities (also known as distributorships) to consumers in or around summer 2003. The distributorships were sold by a division of Elite Designs called "The Designer Collection." The term "The Designer Collection" is featured prominently in the promotional material Elite Designs sent to potential jewelry investors. Defendant Antonelli incorporated The Designer Collection as a distinct entity in September 2004. The Designer Collection thereafter sold jewelry display rack business opportunities. (Antonelli July 2005 deposition, attached as Exhibit 7, at p. 19, lines 6 - 18 (discussing distributor list that is attached as Exhibit 24); p. 22, lines 9 - 19; p. 176, line 22 - p. 177, line 13; p. 182, line 25 - p. 183, line 11; Elite Designs Packet, attached as Exhibit 4).

9. Elite Designs and The Designer Collection advertised their jewelry display rack business opportunities in advertisements placed in newspapers around the country. The advertisements often made representations about the earnings consumers could make from

investing in the business opportunity. The advertisements listed a toll-free telephone number for consumers to call to learn more about the business opportunity. (Antonelli July 2005 deposition, attached as Exhibit 7, at p. 84, line 18 - p. 85, line 9; p. 201, lines 5 - 12; Response to Request for Admissions, attached as Exhibit 3, Response Nos. 12, 13, 65 (referencing an ad that is attached as Exhibit 25), 67 (referencing an ad that is attached as Exhibit 26); Advertisements, attached as Exhibits 27 and 28).

10. An advertisement used by Elite Designs in several newspapers read:

> ACCOUNT REP/LOCAL ROUTE. No selling. Make $100K/yr.
> restocking in store displays. $12,950 investment includes
> inventory & territory. 888-324-1081

The advertisement did not include a statement of the number and percentage of prior purchasers that had done as well or better than the earnings claim made in the advertisement. (Response to Request for Admissions, Response No. 5, attached as Exhibit 3; List of Advertisements, attached as Exhibit 26).

11. None of the advertisements for Elite Designs that contained an earnings claim included a statement of the number and percentage of prior purchasers that had done as well or better than the advertised earnings claim. (Antonelli September 2005 deposition at p. 33, lines 4 - 13, attached as Exhibit 8;[2] Response to Request for Admissions, Response No. 12, attached as Exhibit 3).

---

[2] The deposition transcript reads "higher purchasers" rather than "prior purchasers." The government notes at pages 26-27 of the deposition transcript, lines 13-6, the government posed this very same question to Antonelli about The Designer Collection. The transcript there accurately records the government as asking about "prior" rather than "higher" purchasers.

12. An advertisement used by The Designer Collection in several newspapers read:

EARN $100K! ACCOUNT REP/LOCAL ROUTE. No selling.
Simply restocking displays. Accounts, inventory & territory. $9950 inv.
Fin. avail. 800-215-7434

The advertisement did not include a statement of the number and percentage of prior purchasers that had done as well or better than the earnings claim made in the advertisement. (Response to Request for Admissions, Response No. 6, attached as Exhibit 3; Advertisement, attached as Exhibit 27).

13. None of the advertisements for The Designer Collection that contained an earnings claim included a statement of the number and percentage of prior purchasers that had done as well or better than the earnings claim. (Antonelli September 2005 deposition at p. 26, line 13 - p. 27, line 6, attached as Exhibit 8; Response to Request for Admissions, Response No. 13, attached as Exhibit 3).

14. Prospective jewelry distributors who called Elite Designs' or The Designer Collection's toll-free telephone number were ultimately connected to defendants' or defendants' employees and agents. (Antonelli July 2005 deposition at p. 85, lines 4 - 21, attached as Exhibit 7; Response to Request for Admissions, Response Nos. 32, 34, 35, 37, 38, 40, attached as Exhibit 3; Vera Transcript (8/3/04),[3] attached as Exhibit 29; Vera Transcript (8/5/04), attached as

---

[3] On August 3, 2004, Martha Vera, a Federal Trade Commission ("FTC") investigator, called Elite Designs' toll-free number posing as a prospective customer by the name of Billie Peters. Investigator Vera's telephone calls were recorded and transcribed. Citations to the telephone transcripts are referenced by Ms. Vera's name and the date of the call.

Exhibit 30; Menjivar Transcript (7/30/04),[4] attached as Exhibit 31, Menjivar Transcript (8/2/04), attached as Exhibit 32, Menjivar Transcript (8/4/04), attached as Exhibit 33).

15. After prospective investors contacted Elite Designs or The Designer Collection by calling the toll free number advertised in the newspapers, defendants or defendants' employees and agents typically sent potential investors pre-investment promotional material that included, but was not limited to:

a. A welcome letter extolling, "With a minimal investment of time and money, you will quickly reach a level of financial return that would prove impossible in nearly any comparable business venture. Besides the initial training and our promise of ongoing support, all displays, inventory, and necessary paperwork will be included in the purchase price." (Elite Designs Packet at bates no. ED-248, attached as Exhibit 4; Designer Collection Packet at bates no. DES-ED-DOCS-781, attached as Exhibit 5).

b. Materials describing the different jewelry display rack packages that could be purchased. The plans include a 30 Display Package for $9,950 (includes 30 display racks, 2,100 pairs of earrings), a 45 Display Package for $14,300 (includes 45 display racks, approximately 3,150 pairs of earrings), and a 60 Display

[4] On July 30, 2004, Roberto Menjivar, a Federal Trade Commission ("FTC") investigator, called Elite Designs' toll-free number posing as a prospective customer by the name of Javier Rodriguez. Investigator Rodriguez's telephone calls were recorded and transcribed. Citations to these telephone transcripts are referenced by Mr. Menjivar's name and the date of the call.

Package for $18,900 (includes 60 display racks, 4,200 pairs of earrings).[5] (Elite Designs Packet at bates nos. ED-258 to ED-260, attached as Exhibit 4; Designer Collection Packet at bates nos. DES-ED-DOCS-791 to DES-ED-DOCS-793, attached as Exhibit 5).

c. A document titled "How Can We Lead You Down the Road to Success?" This document promises potential jewelry distributors that, "[w]hile you operate your business under your own business name, The Designer Collection will provide you with sparkling products, complete and easy training, a Distributor start-up kit, and an extensive representative support program. This tried and tested program includes locations, a toll-free customer service line, bonus merchandise, free shipping, an exchange policy and more." (Elite Designs Packet at bates no. ED-250, attached as Exhibit 4; Designer Collection Packet at bates no. DES-ED-DOCS-784, attached as Exhibit 5).

d. A document titled "The Designer Collection's Company Support." This document assures potential jewelry distributors that an operations manual designed by "distributor specialists" will take the distributor "step by step through every phase of the business, beginning with the very first day." The document also states that Elite Designs and The Designer Collection provide distributors

---

[5] In some promotional brochures for Elite Designs the cost of employing a locating service was included in the price of the jewelry display rack packages. In these brochures, the 30 Display Package cost $12,950, the 45 Display Package cost $18,800, and the 60 Display Package cost 24,900. (See Exhibit 34).

with business cards, order forms, consignment forms, and counter-top signs. (Elite Designs Packet at bates no. ED-251, attached as Exhibit 4; Designer Collection Packet at bates no. DES-ED-DOCS-785, attached as Exhibit 5).

e. Material emphasizing that individuals who invest in a distributorship can work at the business opportunity "Part or Full Time." The material claims that there is "No Selling" and the investment produces "Immediate Cash Flow with High Profit Margins." (Elite Designs Packet at bates no. ED-253, attached as Exhibit 4; Designer Collection Packet at bates no. DES-ED-DOCS-787, attached as Exhibit 5).

f. A document titled "Locating Accounts . . . What Should I DO?" This document explains that although defendants provided distributors with training, through a manual, for the purpose of locating one's own accounts, defendants are aware that distributors may "desire professional assistance" in this area. The document provides that there are "many dependable locating firms" nationwide that guarantee "complete satisfaction" and some locating services "actually line up the retail outlets before we [Elite Designs/The Designer Collection] find a distributor for that area." The document states that, "[w]ithout question, a selection of pre-set, high quality retail locations will take all the worry out of starting a new business venture. Just like ou[r] quality products and service, we want to offer advice on important issues such as this one because it enhances our customer service and quality products." Thus, the names and toll-free telephone numbers of

a few locating services that are "familiar with our product" and which have "worked successfully with many of our distributors" are provided.[6] (Elite Designs Packet at bates no. ED-255, attached as Exhibit 4).

g. A document titled "Your Path to Profit." This document contains a table where yearly profit is determined based on the number of sales per week and number of locations. The number of sales per week range from 4 sales for 30 display racks up to 12 sales per week for 100 display racks. The table shows the corresponding annual profit potential ranging from $26,520 (30 display racks averaging 4 sales a week) to $265,200 (100 display racks averaging 12 sales a week).[7] (Elite Designs Packet at bates no. ED-261, attached as Exhibit 4).

h. Material describing a one-year money back guarantee. (Elite Designs Packet at bates no. ED-265, ED-278, ED-279, attached as Exhibit 4).[8]

---

[6] The language in this document varies slightly in different iterations of defendants' promotional material. Any difference in language is immaterial in nature. (Designer Collection Packet at bates no. DES-ED-DOCS-799, attached as Exhibit 5).

[7] In a recent iteration of The Designer Collection's promotional material, the profit table was removed. (Designer Collection Packet at bates no. DES-ED-DOCS-794, attached as Exhibit 5). As of December 2004, the promotional material sent to potential investors still contained the profit table. (Scorza Declaration at bates nos. ED-2271, ED-2294, attached as Exhibit 36).

[8] The one-year money back guarantee is replaced by a guaranteed buy back plan in a recent version of The Designer Collection's promotional material. (Designer Collection Packet at bates no. DES-ED-DOCS-798, attached as Exhibit 5).

i. Material describing an exchange program for slow-moving jewelry. (Elite Designs Packet at bates no. ED-256, attached as Exhibit 4; Designer Collection packet at bates no. DES-ED-DES-789, attached as Exhibit 5).

j. Material explaining that the jewelry can be sold in a variety of retail outlets. (Elite Designs Packet at bates no. ED-254, attached as Exhibit 4; Designer Collection packet at bates no. DES-ED-DOCS-788, attached as Exhibit 5).

16. Some jewelry distributors attempted to get their money back via the one-year money back guarantee. Defendants determined that none of the distributors qualified for the money back guarantee. (Antonelli July 2005 deposition at p. 110, line 17 - p. 111, line 9, attached as Exhibit 7; See e.g., Letter to Morgan, attached as Exhibit 15).

17. It was standard practice for Elite Designs and The Designer Collection to provide prospective jewelry investors with the names and phone numbers of professional locating services. (Antonelli July 2005 deposition at p. 99, line 19 - p. 100, line 8; p. 197, lines 1 - 17, attached as Exhibit 7).

18. Antonelli wrote at least one check for $6,000 to JS Locating, one of the professional locating services advertised in Elite Designs and/or The Designer Collection promotional material. (Response to Request for Admissions, attached as Exhibit 3, Response No. 81, (referencing a check that is attached as Exhibit 11); Elite Designs Packet at bates no. ED-255, attached as Exhibit 4).

19. Elite Designs and The Designer Collection sent potential investors a basic franchise disclosure document ("disclosure document") prior to investment.[9] The disclosure documents were inaccurate and/or incomplete because:

a. None of the disclosure documents contain the names, addresses, and telephone numbers of any of the existing jewelry distributors. (Antonelli July 2005 deposition at 133, lines 9 - 13, attached as Exhibit 7; Antonelli September deposition at p. 45, lines 9 - 12, attached as Exhibit 8; Disclosure Documents attached as Exhibit 21 at "Information Regarding Existing Distributors," bates no. DES-ED-DOCS-765; Exhibit 35 at § 436.1 (A)(16), bates no. ED-268; Exhibit 37 at § 436.1 (A)(16), bates no. ED-1860; Exhibit 38 at "Information Regarding Existing Distributors," bates no. ED-907).

b. All of the disclosure documents state that Antonelli graduated from the University of Rhode Island. Antonelli never graduated from the University of Rhode Island. (Antonelli July 2005 deposition at p. 128, line 2 - p. 129, line 5, attached as Exhibit 7; Disclosure Documents, attached as Exhibit 21 at "Identity and Prior Business Experience of the Principal," bates no. ED-DOCS-DES-763; Exhibit 35 at § 436.1 (A)(2), bates no. ED-267; Exhibit 37 at § 436.1 (A)(2), bates no.

---

[9] Defendants' made changes to their disclosure document on a number of occasions. The government is aware of disclosure documents dated January 2003 (attached as Exhibit 37), January 2004 (attached as Exhibit 35), September 1, 2004 (attached as Exhibit 38), and January 10, 2005 (attached as Exhibit 21).

ED-1859; Exhibit 38 at "Identity and Prior Business Experience of the Principal," bates no. ED-905).

c. The January 2003 and January 2004 disclosure documents provide that Elite Designs has "232 distributors operating in 37 states." Neither Elite Designs nor The Designer Collection ever possessed 232 jewelry distributors. (Antonelli July 2005 deposition at p. 129, line 17 - p. 130, line 16, attached as Exhibit 7; Disclosure Documents, attached as Exhibit 35 at § 436.1 (A)(16), bates no. ED-268; Exhibit 37 at § 436.1 (A)(16), bates no. ED-1860).

d. The September 1, 2004, and January 10, 2005, disclosure documents fail to disclose that Antonelli is subject to an Order to Cease and Desist ("Order") issued by the State of South Dakota in August 2004. The Order was issued, in part, due to untrue and misleading statements made in connection with the sale of one of Antonelli's candle display rack business opportunities. (Order, attached as Exhibit 39; Disclosure Documents, attached as Exhibit 21 at "Litigation and Bankruptcy," bates no. DES-ED-DOCS-763, and Exhibit 38 at "Litigation and Bankruptcy," bates no. ED-905).

20. Elite Designs' and The Designer Collection's sales representatives made numerous claims and promises to prospective investors about Elite Designs' and The Designer Collection's business opportunities, including the following:

a. "Okay. This requires no sales on your part whatsoever. The product sells itself." (Vera Transcript (8/5/04) at bates no. ED-347, lines 18 - 19, attached as Exhibit

30; Similar quotation appears in Menjivar Transcript (8/4/04) at bates no. ED-88, line 25 to ED-89, line 1, attached as Exhibit 33).

b. "Now, we manufacture hundreds of different styles of necklaces, bracelets, anklets and rings for many large companies such as Liz Claiborne, Ann[e] Klein and Monet just to name a few." (Vera Transcript (8/5/04) at bates no. ED-348, lines 14 -17, attached as Exhibit 30; Similar quotation appears in Menjivar Transcript (8/4/04) at bates no. ED-91, lines 13 - 16, attached as Exhibit 33).

c. "Now these are earrings that sell in big department stores for $15 to $30 under the names Ralph Lauren, Liz Claiborne and Ann[e] Klein." Vera Transcript (8/5/04) at bates no. ED-349, lines 1 - 3, attached as Exhibit 30; Similar quotation appears in Menjivar Transcript (8/4/04) at bates no. ED-92, lines 6 - 10, attached as Exhibit 33).

d. "Well, as I said, when it's time to service your accounts, you'll simply visit each store once every two weeks to replace the earrings that were sold." (Vera Transcript (8/5/04) at bates no. ED-356, lines 20 - 23, attached as Exhibit 30).

e. "[Y]ou'll get all the necessary paperwork to run your business, order forms, inventory and accounting forms. We also have a full-time customer service staff that is available to assist you during normal business hours . . . ." (Vera Transcript (8/5/04) at bates no. ED-357, lines 2 - 6, attached as Exhibit 30; Similar quotation appears in Menjivar Transcript (8/4/04) at bates no. ED-110, line 22 to ED-111, line 3, attached as Exhibit 33).

f. "We have found that you can easily service three accounts per hour including driving time . . . ." (Vera Transcript (8/5/04) at bates no. ED-357, lines 10 - 12, attached as Exhibit 30; Similar quotation appears in Menjivar Transcript (8/4/04) at bates no. ED-111, lines 15 - 16, attached as Exhibit 33).

g. It's a "turnkey business." Elite Designs and/or The Designer Collection provides "[e]verything that you need to get you up and running fast." (Menjivar Transcript, (8/4/04) at bates no. ED-104, lines 3- 5, attached as Exhibit 33).

h. "We set you up in business and then you buy from us for years to come. That's how it works." (Menjivar Transcript (10/21/04) at bates no. ED-144, lines 9 - 11, attached as Exhibit 40).

i. Regarding the need to invest quickly: Eight or nine prospective distributors are already competing for that territory, "[a]nd as you know, opportunities are never lost, they're only taken by other people, and I'd hate to see you lose out." (Menjivar Transcript (8/4/04) at bates no. ED-120, lines 3 - 25, attached as Exhibit 33).

j. Regarding locating services: "And one nice thing is, if you don't want to, you don't ever have to get the retail stores yourself. That can be done for you. You can actually hire a professional marketing company . . . that specializes in retail product placement. We give you a list of about 10 to choose from." (Vera Transcript (8/5/04) at bates no. ED-349, line 20 to ED-350, line 3, attached as

Exhibit 30; Similar quotation appears in Menjivar Transcript (8/4/04) at bates no. ED-93, lines 15 - 20, attached as Exhibit 33).

k. Regarding locating services: "[The locating services] place all types of products, like the ATM machines out there that you've seen. And when it's comes to placing your earrings, it's really just a matter of them contacting the existing account and telling them they'd like to introduce a new product. And when you're ready to get started, you'll get a list of stores who are waiting for the earrings. It's really just a matter of picking out the ones you like best." (Vera Transcript (8/5/04) at bates nos. ED-350, line 19 to ED-351, line 2, attached as Exhibit 30; Similar quotation appears in Menjivar Transcript (8/4/04) at bates no. ED-93, line 15 to ED-94, line 18, attached as Exhibit 33).

l. Regarding locating services: "And a reason a lot of people like to use a [locating service] is because for most people, that's really the most expeditious way to get up and running." (Menjivar Transcript (10/21/04) at bates no. ED-148, lines 1 - 4, attached as Exhibit 40).

m. Regarding locating services: "The locators can usually get all of your stores located within about a week. So, you can actually be up and running, making money, within about two weeks if you use a marketing company." (Menjivar Transcript (10/21/04) at bates no. ED-148, lines 6 - 9, attached as Exhibit 40).

n. Regarding locating services: The price for a locating service is "already included in the investment. If you wanted to get the stores yourself, you'll save $3,000 off

your initial investment." (Vera Transcript (8/5/04) at bates no. ED-352, lines 3 - 8, attached as Exhibit 30).

o. Regarding locating services: "I would say between maybe two and three locators should be listed in the package that you have." (Vera Transcript (8/20/04) at bates no. ED-401, lines 3 - 6, attached as Exhibit 41, Tab C; Similar quotation appears in Menjivar Transcript (8/4/04) at bates no. ED-146, lines 16 - 18, attached as Exhibit 33).

p. Regarding finding locations on one's own: "You shouldn't have–you're not going to have any problem getting locations." (Menjivar Transcript (10/21/04) at bates no. ED-162, lines 4 - 5, attached as Exhibit 40).

q. Regarding finding locations on one's own: "Okay, now, the best part is you don't have to use a marketing company to get your stores. You get a complete training package. Included in your training package is a program for getting your accounts. It includes a little presentation that's less than half a page long and you can memorize it in five minutes." (Vera Transcript (8/5/04) at bates no. ED-351, lines 7 -13, attached as Exhibit 30; Similar quotation appears in Menjivar Transcript (8/4/04) at bates no. ED-96, lines 10 - 19, attached as Exhibit 33).

r. Regarding finding locations on one's own: The presentation included in the training package is "so good, no stores will refuse to sell your earrings." (Menjivar Transcript (8/4/04) at bates no. ED-96, lines 18 - 19, attached as Exhibit 33).

s. Regarding finding locations on one's own: "So we're going to hold your hand and show you how to get your accounts on your own. That's only if you choose, you know, that's left to your choice whether or not you want to use a [locating service] or get them on your own." (Menjivar Transcript (8/4/04) at bates no. ED-97, lines 19 - 23, attached as Exhibit 33).

t. Regarding the one-year money back guarantee: "[A]s an insurance policy, you get a one-year money back guarantee in writing, which they say if you don't make your full investment back in one year– . . . we will literally buy the business back from you dollar for dollar." (Vera Transcript (8/5/04) at bates nos. ED-354, line 22 to ED-355, line 10, attached as Exhibit 30; Similar quotation appears in Menjivar Transcript (8/4/04) at bates no. ED-106, lines 11 - 17, attached as Exhibit 33).

u. Regarding the one-year money back guarantee: "Now, in 14 years and over 200 distributors, we have never had to buy a business back from anyone . . . ." (Vera Transcript (8/5/04) at bates no. ED-355, lines 12 - 14, attached as Exhibit 30; Similar quotation appears in Menjivar Transcript (8/4/04) at bates no. ED-106, lines 17 - 19, attached as Exhibit 33).

v. Regarding the one-year money back guarantee: "If you don't–if you're not making money, we actually give you your money back." (Menjivar Transcript (10/21/04) at bates no. ED-149, lines 10 - 12, attached as Exhibit 40).

21. Elite Designs' and The Designer Collection's sales representatives made numerous earnings claims to prospective jewelry distributors, including the following:

a. Our jewelry distributors "usually start on a very part-time basis, about six to eight hours per week . . . . And they take home about $1,000 a week in net profit." (Vera Transcript (8/5/04) at bates no. ED-347, lines 6 - 11, attached as Exhibit 30).

b. "[W]e know [based on reorders] that the average store is selling at least two pairs of earrings per day." Based on a net profit of $4.25 per sale, two sales per day comes to $8.50. "Now, that's your profit for one day at one store. Now, if you just did a minium of two sales per day and you have 30 accounts, so multiply $8.50 times 30 and that comes out to $255 net profit for the day. So, $255 a day times, say, six days a week, comes out to $1,530 a week . . . . So, how does that sound to you so far? . . . . Well, $1,500 a week is over $75,000 a year, and all you have to do is service your accounts one day a week." (Vera Transcript (8/504) at bates nos. ED-352, line 19 to ED-353, line 20, attached as Exhibit 30; Similar quotation appears in Menjivar Transcript (8/4/04) at bates nos. ED-98, line 1 to ED-99, line 6, attached as Exhibit 33).

c. "Now, most people make their investment back in three to four months . . . ." (Vera Transcript (8/5/04) at bates no. ED-354, lines 21 - 22, attached as Exhibit 30; Similar quotation appears in Menjivar Transcript (8/4/04) at bates no. ED-107, lines 19 - 22, attached as Exhibit 33).

d. The earring exchange policy, allowing jewelry distributors to exchange slower-selling earrings, is "your guarantee of success that you will definitely make money with this opportunity." (Vera Transcript (8/5/04) at bates no. ED-355, lines 20 - 22, attached as Exhibit 30; Similar quotation appears in Menjivar Transcript (8/4/04) at bates no. ED-106, lines 23 - 25, attached as Exhibit 33).

e. As a result of the one-year money back guarantee, "no matter what, you're going to make your money back." (Menjivar Transcript (8/4/04) at bates no. ED-107, lines 14 - 15, attached as Exhibit 33).

f. "And if you're the distributor chose[n] for that territory, we get you set up and started making money immediately. Immediately." (Menjivar Transcript (8/4/04) at bates no. ED-95, lines 14 - 16, attached as Exhibit 33).

g. "Our people do very well [financially]." (Menjivar Transcript (10/21/04) at bates no. ED-149, line 21, attached as Exhibit 40).[10]

22. A sales script titled "Collection Script" approved by Antonelli and employed by Elite Designs and The Designer Collection sales representatives in 2004 and part of 2005, see Antonelli July 2005 deposition at p. 205, lines 10 - 18, attached as Exhibit 7, provides:

a. "Our distributors usually start on a very part-time basis, about 6 or 8 *hours per week*–and some have built their business to the point where they take home

[10] See also Response to Request for Admissions, attached as Exhibit 3, Response Nos. 9, 10 (referencing the Vera and Menjivar Transcripts).

*$1000.00 a week or more in net profit.*" (emphasis in original).[11] (Sales Script at bates no. DES-ED-DOCS-748, attached as Exhibit 20).

b. "This requires no sales on your part whatsoever! The product sells itself!" (emphasis in original). (Sales Script at bates no. DES-ED-DOCS-748, attached as Exhibit 20).

c. "Now, here's how you make your money . . . . Our products are sold through existing retail locations, such as pharmacies, gift shops, card shops, florists convenience stores, etc. *Each pair of **Designer Collection** earrings retails for $9.49 . . . . The store gets 30% of the $9.95 which is $3.00 . . . $9.95-$3.00 = $6.95 so the store will pay you $6.95 per pair. Your reorder cost is $2.50 per pair . . . . $6.95 minus your $2.50 cost leaves $4.45 profit per sale." (emphasis in original). (Sales Script at bates no. DES-ED-DOCS-750, attached as Exhibit 20).

d. "Getting back to how you make your money: in a really good location, you can easily sell 3 to 4 pairs of earrings a day–but to be conservative, let's use an example of selling only 2 pairs a day on average (do you have a calculator handy?) You remember you make $4.45 on every sale right? (Make him get a calculator and/or write this down). If you multiple $4.45 times 2 sales per day, that comes out to $8.90. That's your profit for one day, at one store, if you just do [] 2 sales per day. You have 30 accounts, so multiply $8.90 times 30 and that comes out to

---

[11] The quotations taken from the sales script omit the script's use of all capital letters.

$267.00 profit for the day. $267.00 a day times say six days a week comes out to $1,602 a week. Over $1500 a week! How's that sound to you _______ (WFA) and $1500 a week is over $75,000 a year! And all you have to do is service your accounts one day a week." (Sales Script at bates no. DES-ED-DOCS-752, attached as Exhibit 20).

e. ". . . we can have you up and running making money right away–usually less than two weeks!" (Sales Script at bates no. DES-ED-DOCS-752, attached as Exhibit 20).

f. "You get a money back guarantee in writing which states that if you follow our marketing plan, and you don't make your full investment back within 14 months, we will buy back from you any earrings you have left from your original inventory–dollar for dollar." (Sales Script at bates no. DES-ED-DOCS-753, attached as Exhibit 20).

g. Because of the earring exchange policy "**you will definitely make money with this opportunity**." (emphasis in original). (Sales Script at bates no. DES-ED-DOCS-754, attached as Exhibit 20).

h. "We manufacture hundreds of different styles of necklaces, bracelets, anklets, pins, charms and rings for many large companies such as *Liz Claiborne, Anne Klein and Monet* to name a few." (emphasis in original). (Sales Script at bates no. DES-ED-DOCS-749, attached as Exhibit 20).

i. "These are earrings that sell in the big department stores for 15-30 dollars under the names Ralph Lauren, Liz Claiborne, Anne Klein, etc. . . ." (Sales Script at bates no. DES-ED-DOCS-750, attached as Exhibit 20).

j. "You get all of the necessary paperwork to run your business such as order forms, inventory and accounting forms. We also have a full customer service staff that is available to assist you during normal business hours." (Sales Script at bates no. DES-ED-DOCS-755, attached as Exhibit 20).

k. "When it's time to service your accounts, you'll simply visit each store once every 2 weeks to replace the earrings that were sold . . . . We have found most distributors can easily service 3 accounts per hour, including driving time." (Sales Script at bates nos. DES-ED-DOCS-755 to DES-ED-DOCS-756, attached as Exhibit 20).

l. Regarding locating services: "And the **best** part is you don't have to find the retail stores yourself–you can actually hire a professional locating company that specializes in retail product placement–we give you a list of several to choose from."[12] (emphasis in original). (Sales Script at bates no. DES-ED-DOCS-751, attached as Exhibit 20).

---

[12] Antonelli testified that the word "best" is highlighted in the sales script "[b]ecause most people are not willing to go out and get the retail locations on their own. They much rather would pay a locating service to do that for them." (Antonelli July 2005 deposition at 206, line 10 - 207, line 4, attached as Exhibit 7).

m. Regarding locating services: The locating companies "have thousands of stores all over the country they've already done business with for all *types* of products. When it comes to placing your earring displays–it's really just a matter of them contacting their existing accounts and telling them they'd like to introduce a new product." (emphasis in original). (Sales Script at bates no. DES-ED-DOCS-751, attached as Exhibit 20).

n. Regarding locating services: "When you're ready to get started, you'll get a list of stores who are waiting for your earrings and displays, it's really just a matter of picking out the ones you like best. If you are the distributor chosen for that territory, we get you set up and started making money immediately." (Sales Script at bates no. DES-ED-DOCS-751, attached as Exhibit 20).

o. Regarding locating services: "One of the locating companies that we've had real success with is Evans Consulting. 'Evans Consulting.' Their # is 800-589-0889. The owner of the company handles our account there. His name is Dave Evans. I know we've been on the phone a long time but when we hang up, I want you to take **2 minutes** and give Dave a call. Tell him that you were talking to ______ at *Designer [Collection]* and that you're going to be working in (Prospects territory), and you want to ask him, how many accounts he has in your area; how his guarantee works; in fact, any questions you have about the locations you want to address to Dave Evans, and assuming he can answer your questions to your satisfaction, Dave will get an information package out to you too. And we'll go

ahead and send out the sample and information to you . . . ." (emphasis in original). (Sales Script at bates no. DES-ED-DOCS-757, attached as Exhibit 20).

p. Regarding references: " . . . if you like, you can even speak with a bunch of people who are already in the business. You see (first name) we expect you to check this out thoroughly. Because our track record is impeccable [sic]. Once you check us out, and you see everything is exactly as I'm telling you, is there anything at all you see that could prevent you from getting started immediately?" (wfa) Good!" (Sales Script at bates nos. DES-ED-DOCS-757 to DES-ED-DOCS-758, attached as Exhibit 20).

23. The sales script titled "Collection Script" was employed by sales representatives for Elite Designs and The Designer Collection, and the sales script contains earnings projections. (Response to Request for Admissions, Response Nos. 24, 25, attached as Exhibit 3).

24. Defendants had no reasonable basis for the earnings claims made in Elite Designs' and The Designer Collection's advertisements, sales scripts, and promotional material:

a. Defendants were not aware of any jewelry distributor that earned $100,000 or more a year from an Elite Designs or The Designer Collection jewelry display rack distributorship. (Antonelli July 2005 deposition at p. 72, lines 10 - 14; p. 120 at lines 15 - 18, attached as Exhibit 7).

b. Defendants did not know of any jewelry distributor that earned $75,000 a year from an Elite Designs or The Designer Collection jewelry display rack distributorship. (Antonelli July 2005 deposition at p. 162, lines 10 - 12, attached

as Exhibit 7; Antonelli September 2005 deposition at p. 22, lines 23 - 25, attached as Exhibit 8).

c. Defendants did not know if any jewelry distributor earned $50,000 a year from an Elite Designs or The Designer Collection jewelry display rack distributorship. (Antonelli July 2005 deposition at p. 72, lines 15 - 17, attached as Exhibit 7; Antonelli September 2005 deposition at p. 23, lines 1 - 4, attached as Exhibit 8).

d. Defendants do not know if any Elite Designs or The Designer Collection distributor earned $1600 a week. (Antonelli September 2005 deposition at p. 51, line 15 - p. 52, line 16, attached as Exhibit 8).

e. Defendants did not actively track how much money the average Elite Designs and The Designer Collection jewelry distributor earned. (Antonelli July 2005 deposition at p. 154, line 25 - p. 156, line 13, attached as Exhibit 7; Antonelli September 2005 deposition at p. 25, lines 6 - 22, attached as Exhibit 8).

f. The statement made by a sales representative to an undercover FTC investigator that the average jewelry distributor is selling at least 2 pairs of earring per day per location was "[b]ased on the fact that if there's 48 pairs of earrings on a display sitting in a tanning salon that has 75 women walking in daily, odds are you're probably going to sell at least two pairs of earrings." (Antonelli July 205 deposition at p. 163 lines 4 - 15, attached as Exhibit 7).

g. The assertion in the sales script approved by Antonelli that in a really good location a jewelry distributor can easily sell 3 to 4 pairs of earrings, and can

conservatively sell 2 pairs of earrings a day, is based on "speculation." (Antonelli September 2005 deposition at p. 49, line 8 - p. 50, line 23, attached as Exhibit 8).

25. Defendants never advised potential Elite Designs and The Designer Collection distributors that material substantiating earnings claims was available for inspection. (Antonelli July 2005 deposition at p. 163, line 16 - p. 164, line 10, attached as Exhibit 7; Response to Request for Admissions, Response Nos. 7, 8, attached as Exhibit 3).

26. Defendants did not provide potential Elite Designs and The Designer Collection distributors with an earnings claim document as prescribed by the Franchise Rule, 16 C.F.R. Part 436. (Response to Request for Admissions, Response Nos. 14, 15, attached as Exhibit 3).

27. Defendants did not know if any of the jewelry that they provided to Elite Designs and The Designer Collection jewelry distributors was sold by companies such as Anne Klein, Monet, or Ralph Lauren. (Response to Request for Admissions, Response Nos. 29, 30, 31, attached as Exhibit 3).

28. In order to obtain promotional material from Elite Designs and/or The Designer Collection, some potential jewelry distributors were required to first call a professional locating service. This practice was instituted to gauge if a potential jewelry distributor was truly interested in investing in the business opportunity. If a potential distributor called the professional locating service, that information was relayed back to Elite Designs and/or The Designer Collection. (Antonelli September 2005 deposition at p. 72, line 19 - p. 73, line 19, attached as Exhibit 8; Evans Declaration ¶ 12, attached as Exhibit 22).

29. Elite Designs' and The Designer Collection's sales representatives made numerous claims to potential jewelry distributors about contacting current distributors, including the following:

a. "And let me tell you what we do here, by the way. Let me give you fair warning. Once we've had a customer with us and a distributor for, say, six months to a year or so– . . .–what happens is the customer service department, who our distributors normally deal with, they usually ask the customer if they wouldn't mind taking calls from other prospective distributors . . . . The only thing is they normally can't handle it for more than about a week to 10 days because, you know, we're advertising in the papers. They get a lot of calls . . . . In fact, we–we kind of jokingly refer to them as the distributor of the week because that's about how long they last." (Vera Transcript (8/20/04) at bates no. ED-396, line 13 to ED-397, line 5, attached as Exhibit 41, Tab C; Similar quotation appears in Menjivar Transcript (10/21/04) at bates no. ED-164, lines 1 - 17, attached as Exhibit 40).

b. "So, this [calling the distributor references] will give you a chance to pick up some tips and pointers as to what other people are doing to help make their business successful. So, it's really a good idea. And, also, it will give you kind of what's called a ground level view of what the business is like as opposed to getting all of your information from the company." (Vera Transcript (8/20/04) at bates no. ED-399, lines 14 - 20, attached as Exhibit 41, Tab C; Similar quotation

appears in Menjivar Transcript (10/21/04) at bates no. ED-167, line 16 to ED-168, line 1, attached as Exhibit 40).

c. John McDonald, who identified himself as the marketing director of Elite Designs, provided an undercover FTC investigator with the names and phone numbers of the following Elite Designs or The Designer Collection jewelry distributors who had agreed to speak to potential jewelry investors: Diane Thompson of Connecticut, Desiree Nieves of New York, and Joseph Marano of Maine. (Vera Transcript (8/20/04) at bates nos. ED-397, line 7 to ED-399, line 12, attached as Exhibit 41, Tab C; Menjivar Transcript (10/21/04) at bates no. ED-141, lines 18 - 22, attached as Exhibit 40).

d. Allyzon Santos, a sales representative for Elite Designs and The Designer Collection, provided an undercover FTC investigator with the names and phone numbers of the following Elite Designs or The Designer Collection jewelry distributors who had agreed to speak to potential jewelry investors: Diane Thompson of Connecticut, Patty Oliver of Alabama, Desiree Nieves of New York, and Michael Allen of New York. (Menjivar Transcript (10/21/04) at bates no. ED-163, line 16 to ED-167, line 10, attached as Exhibit 40; Response to Request for Admissions, Response No. 35, attached as Exhibit 3).

30. An undercover FTC investigator called the phone number provided for Diane Thompson of Connecticut. Thompson made the following claims about her experiences as an Elite Designs jewelry distributor:

a. "I absolutely love the business. It's turning out to be better than I thought it was going to be." (Vera Transcript (8/20/04) at bates no. ED-370, lines 1 - 3, attached as Exhibit 41, Tab A).

b. "I bought the 30-package when I started out. . . . I've got almost 50 now." (Vera Transcript (8/20/04) at bates no. ED-370, lines 12 - 18, attached as Exhibit 41, Tab A).

c. Regarding how long it took to recoup her initial investment: "I would say probably about six months–six-and-a-half months." (Vera Transcript (8/20/04) at bates no. ED-372, lines 20 - 21, attached as Exhibit 41, Tab A).

d. "The only thing I could tell you is, you know, my experience, it's only going to be what you make of it." (Vera Transcript (8/20/04) at bates no. ED-375, lines 23 - 25, attached as Exhibit 41, Tab A).

e. Regarding the use of locating services: "You know what–you know, I don't know if they do this or not, but see if you can go half and half, like have the locator set you up with some accounts and then get the rest on your own." (Vera Transcript (8/20/04) at bates no. ED-376, lines 6 - 9, attached as Exhibit 41, Tab A).

f. Diane Thompson stated that she earned close to $60,000 to $75,000 a year from her jewelry display rack distributorship. (Vera Transcript (8/20/04) at bates nos. ED-376, line 24 to ED-377, line 8, attached as Exhibit 41, Tab A).

31. Elite Designs' and The Designer Collection's business records do not reflect that Diane Thompson is a jewelry distributor. Diane Thompson was a sales representative for Elite

Designs and she was paid to pose as a reference. (Distributor List, attached as Exhibit 24; Response to Request for Admissions, Responses Nos. 57, 59, attached as Exhibit 3; Thompson Check, attached as Exhibit 10).

32. According to Declarations the government received from Elite Designs and The Designer Collection jewelry distributors ("Consumer Declarations"),[13] Diane Thompson's name and phone number was provided as a reference to several potential distributors who subsequently invested in a jewelry display rack distributorship. (See e.g., Stachler Declaration at ED-2263, attached as Exhibit 42; Miller Declaration at ED-1838 and ED-1844, attached as Exhibit 43; LaMar Declaration at ED-2405, attached as Exhibit 44).

33. An undercover FTC investigator called the phone number provided for Desiree Nieves of New York. Nieves made the following claims about her experiences as an Elite Designs jewelry distributor:

a. "[The distributorship] is going well. I've been doing it for about six months or so." (Vera Transcript (8/20/04) at bates no. ED-383, lines 7 - 13, attached as Exhibit 41, Tab B).

b. "I started with 30 [displays], but I have 53 now." (Vera Transcript (8/20/04) at bates no. ED-383, lines 23 - 24, attached as Exhibit 41, Tab B).

c. Regarding the use of locating services: "[The first] 30 [displays], I used a locating service, but the others I got on my own. . . . I used Route Builders [one name

[13] The government is housing the original Consumer Declarations. Should the Court seek the originals the government will provide them.

provided in Elite Design's promotional brochures.]" (Vera Transcript (8/20/04) at bates nos. ED-384, line 20 to ED-385, line 1, attached as Exhibit 41, Tab B; Antonelli July 2005 deposition at p. 103, lines 11-12, attached as Exhibit 7).

d. The initial investment already had been recouped. (Vera Transcript (8/20/04) at bates no. ED-385, lines 6 - 12, attached as Exhibit 41, Tab B).

e. Regarding how many hours she devotes to her jewelry display rack distributorship: "And I don't know, I would say that now with the amount of locations that I have, probably--I would say less than 20 hours per week." (Vera Transcript (8/20/04) at bates no. ED-388, lines 6 - 8, attached as Exhibit 41, Tab B).

34. Desiree Nieves was not an Elite Designs or The Designer Collection jewelry distributor.[14] She never owned jewelry display racks, she never had locations, and she never made money from owning an Elite Designs or The Designer Collection jewelry distributorship. She did, however, earn money from the work she performed posing as a successful distributor. (List of Distributors, attached as Exhibit 24; Wagner deposition at p.72, line 5 - p. 73, line16, attached as Exhibit 45).

35. John McDonald, a salesman for Elite Designs and The Designer Collection, told an undercover FTC investigator that Joseph Marano was a distributor from Maine. "Joseph

---

[14] Desiree Nieves was recruited as a reference for Elite Designs by her mother, Madeline Wagner. Madeline Wagner was a sales representative for Elite Designs. Madeline Wagner herself posed as a successful distributor. (See ¶ 37(a), infra.)

Marano" was an alias employed by Joe Macchiarulo, a sales representative for Elite Designs and The Designer Collection. Macchiarulo did not invest in a jewelry distributorship, he did not own jewelry display racks, he did not earn money from a jewelry distributorship, and he lived in Massachusetts not Maine. Macchiarulo testified that he received two checks from Elite Designs and/or The Designer Collection, one for his work in sales and the other for posing as a successful distributor and speaking with potential jewelry investors. Although Macchiarulo employed the alias "Joseph Marano" when posing as a distributor, all of the checks that he received for his reference work were addressed to his real name and, to the best of his recollection, signed by Antonelli. (Vera Transcript (8/20/04) at ED-398, line 22 to ED-399, line 6, attached as Exhibit 41, Tab C; Menjivar Transcript (10/21/04) at ED-141, lines 18 - 22, attached as Exhibit 40; Macchiarulo deposition at p. 193, lines 16 - 18; p. 196, line 20 - p. 197, line 8; p. 198, lines 7 - 9; p. 200, line 17 - p. 202, line 11, attached as Exhibit 9; Response to Request for Admissions, Response Nos. 60, 62, attached as Exhibit 3).

36. Elite Designs' and The Designer Collection's business records do not reflect that Patty Oliver and Michael Allen, the names of two other individuals whom sales representatives identified as current distributors to an undercover FTC investigator, are jewelry distributors. (List of Distributors, attached as Exhibit 24).

37. Consumer Declarations reflect that Elite Designs and The Designer Collection provided potential customers with the names and phone numbers of several other so-called distributors who could be contacted to obtain a real-life view of the investment. The individuals identified by consumers are: Madeline Wagner, Jonathan Timblin, John Baker, Debbie Miller,

Janine Williams, Antoni Ramci, Mike Roberts, Cleo Christofferson, and Marie Butler. (Miller Declaration at bates no. ED-1838, attached as Exhibit 43; Castro Declaration at bates no. ED-976, attached as Exhibit 17; Scorza Declaration at bates no. ED-2275, attached as Exhibit 36; Rasnick Declaration at bates no. ED-2026 to ED-2027, attached as Exhibit 46; Riddle Declaration at bates no. ED-1180, attached as Exhibit 47).

a. Madeline Wagner was not an Elite Designs or The Designer Collection jewelry distributor. She did not purchase jewelry display racks, she was not provided with jewelry display racks, she never had locations, and she never made money from an Elite Designs or The Designer Collection jewelry display rack distributorship. Wagner was a sales representative for Elite Designs. Wagner testified that she received two types of checks from Elite Designs, one for her sales work and one for the work she performed posing as a successful distributor. The checks were signed by Antonelli. According to Consumer Declarations, Wagner was provided as a reference to several consumers who subsequently became jewelry distributors. The notes of one such consumer reflect that Wagner stated that she owned 63 jewelry display racks, sold between 2,400 to 2,800 earrings a month, and recouped her initial investment in five months. (Wagner deposition, attached as Exhibit 45, at p. 63, line 24 to p. 64, line 24; p. 67, line 16 - p. 69, line 12; p.70, line 13 - p. 71, line 20; Response to Request for Admissions, attached as Exhibit 3, Response Nos. 54, 56, 77 (referencing a check that is attached as Exhibit 48), 79 (referencing a check that is attached as Exhibit 49); Andress Declaration at

bates nos. ED-1483 to ED-1484, attached as Exhibit 50; LaMar Declaration at bates nos. ED-2405 to ED-2406, attached as Exhibit 44; Rasnick Declaration at bates nos. ED-2026 to ED-2027, attached as Exhibit 46).

b. Jonathan Timblin was not an Elite Designs or The Designer Collection distributor. He did not own any jewelry display racks, he did not have any locations, and he did not make any money from an Elite Designs or The Designer Collection distributorship. He was, however, paid by The Designer Collection to pose as a successful distributor and speak to potential customers. On May 3, 2005, The Designer Collection sent Jonathan Timblin a check for $200.00 for "References." The check is signed by Defendant Antonelli. Jonathan Timblin also used the alias "Jonathan Baker" when speaking to potential investors. (Timblin deposition, attached as Exhibit 51, at p. 8, line 23 - p. 12 , line 15; p. 27, line 13 - p. 28, line 12; p. 30, line 1 - p. 31, line 7; p. 36, line 2 - p. 39, line 13; p. 70, line 22 - p. 71, line 14; Response to Request for Admissions, attached as Exhibit 3, Response Nos. 87 (referencing a check that is attached as Exhibit 52) and 89 (referencing a check that is attached as Exhibit 53).

c. Debbie Miller was not an Elite Designs or The Designer Collection distributor. She did not own any jewelry display racks, she did not have any locations, and she did not make any money from investing in an Elite Designs or The Designer Collection distributorship. Nevertheless, Miller told potential distributors that the earnings calculations contained in the profits table included in most of Elite

Designs' and The Designer Collection's promotional material were attainable. According to the profits table, if a distributor sells 4 pairs of earrings for $4.25 every week at 100 stores, the distributor will earn $88,400 per year. Miller testified that she did know if any Elite Designs or The Designer Collection investor earned $88,400, nor did she know if any investor made four sales per week. Miller was paid by The Designer Collection to talk to potential distributors. Miller, for instance, received a check from The Designer Collection dated May 3, 2005, for "References."[15] The check is signed by Defendant Antonelli. (Miller deposition, attached as Exhibit 54, at p. 40, lines 18 - 24; p. 46, lines 18 - 21; p. 49, line 17 - p. 50, line 22 (discussing promotional material at ED-261, attached as Exhibit 4); p. 51, lines 1-18; p. 52 lines 20 - 25; p. 64, lines 15 - 22; Response to Request for Admissions, attached as Exhibit 3, Response Nos. 95 (referencing a check that is attached as Exhibit 55), 97 (referencing a check that is attached as Exhibit 56).

d. Elite Designs' and The Designer Collection's business records do not reflect that Antoni Ramci is a jewelry distributor. In fact, Antoni Ramci is spelled "Anthony Renzi" and the latter was an alias employed by Joe Macchiarulo's brother, Anthony Macchiarulo, Jr. Macchiarulo, Jr. posed as a jewelry distributor. On February 21, 2005, a check was written from The Designer Collection to Anthony

---

[15] The check is written to "Deb Rich," Miller's married name. (Miller deposition at p. 6, lines 12 - 15, attached as Exhibit 54).

Macchiarulo. The check reflects that the payment is for "References/Deals." (List of Distributors, attached as Exhibit 24; Macchiarulo deposition at p. 180, lines 6 -19, attached as Exhibit 9; Macchiarulo Check, attached as Exhibit 57).

e. Elite Designs' and The Designer Collection's business records do not reflect that Cleo Christofferson owns a jewelry distributorship. In truth, Cleo Christofferson was a friend of Madeline Wagner's. The latter asked him to pose as a distributor and talk to potential investors. (List of Distributors, attached as Exhibit 24; Wagner deposition at p. 75, lines 7 - 23, attached as Exhibit 45).

f. Elite Designs' and The Designer Collection's business records do not reflect that Marie Butler, Mike Roberts, and Janine Williams are jewelry distributors. (List of Distributors, attached as Exhibit 24).

38. Antonelli approved a basic disclosure document dated January 2004 that Elite Designs and The Designer Collection sent to prospective jewelry investors. The disclosure document is inaccurate and incomplete because it does not contain the names, addresses, and telephone numbers of any of the existing jewelry distributors, the document incorrectly states that Antonelli graduated from the University of Rhode Island, and the document maintains that Elite Designs has 232 distributors operating in 37 states. Antonelli testified, however, that neither Elite Designs nor The Designer Collection ever possessed 232 jewelry distributors. (Antonelli July 2005 deposition at p. 127, line 5 - p. 130, line 7; p. 133, lines 9-16, attached as Exhibit 7).

39. Antonelli compiled the information contained in a basic disclosure document dated January 2005 that Elite Designs and The Designer Collection sent to prospective jewelry

investors. The disclosure document is inaccurate and incomplete because it does not contain the names, addresses, and telephone numbers of any of the existing jewelry distributors, the document incorrectly states that Antonelli graduated from the University of Rhode Island, and the document fails to disclose that Antonelli is subject to an Order issued by the State of South Dakota in August 2004. The Order was issued, in part, due to misleading and untrue statements made in connection with the sale of Antonelli's candle display rack business opportunities. (Antonelli July deposition at p. 185, lines 5 - 24, attached as Exhibit 7; January 2005 Disclosure Document, attached as Exhibit 21; Order, attached as Exhibit 39).

40. Antonelli sent a Response to the State of South Dakota regarding the Order to Cease and Desist. (Response to Order, attached as Exhibit 58).

41. Antonelli approved a newspaper advertisement for The Designer Collection containing an earnings claim of "$100K+ yr potential." Antonelli does not know of any jewelry distributor for The Designer Collection that earned $100,000 from the distributorship. (Antonelli July 2005 deposition, attached as Exhibit 7, at p. 144, line 7 - p. 145, line 5 (discussing an advertisement attached as Exhibit 18); p. 146, lines 15 - 23).

42. Antonelli approved Elite Designs and The Designer Collection promotional material containing a table where yearly profit is determined based on the number of sales per week and number of locations. The number of sales per week range from 4 sales per day per 30 display racks up to 12 sales per week per 100 display racks. The table shows the corresponding annual profit potential ranging from $26,520 (30 display racks averaging 4 sales a week) to $265,200 (100 display racks averaging 12 sales a week). (Antonelli July 2005 deposition, attached as

Exhibit 7, at p. 87, line 22 -p. 90 lines 11 (discussing promotional packet at ED-261 that is attached as Exhibit 4)).

Respectfully submitted,


UNITED STATES OF AMERICA

PETER D. KEISLER, JR.
Assistant Attorney General
Civil Division
U.S. Department of Justice

EUGENE M. THIROLF
Director
Office of Consumer Litigation

AMY E. GOLDFRANK, Trial Attorney
Office of Consumer Litigation
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20044
202 307-0050
Fax: 202 514-8742

ROBERT CLARK CORRENTE
United States Attorney

ROBIN E. FEDER
Assistant United States Attorney
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903
401 709-5000
Fax: 401 709-5017

OF COUNSEL:

LOIS GREISMAN
Associate Director for Marketing Practices
Federal Trade Commission

MICHAEL J. DAVIS
Attorney
Federal Trade Commission
600 Pennsylvania Ave., N.W., Rm. 238
Washington, DC 20580
202 326-2458
Fax: 202 326-3395

CERTIFICATE OF SERVICE

I hereby certify that the aforementioned "United States' Statement of Undisputed Facts" was sent from the Office of Consumer Litigation, Department of Justice, Washington, D.C. via Federal Express on May 31, 2006, to:

Jeffrey K. Techentin
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, Rhode Island 02903

Attorney for Defendants Elite Designs, Inc., The Designer Collection, Inc. and Anthony Antonelli

Amy E. Goldfrank